UNITED STATES, Appellee

v.

FRANK J. JOHNSON, JR., Private E-2
U. S. Army, Appellant

6 USCMA 20, 19 CMR 146

No. 5878

Decided June 10, 1955

Lt Col Edward Duvall, U. S. Army, and 1st Lt Anthony R. DeSanto, U. S. Army, for Appellant.

Lt Col Thomas J. Newton, U. S. Army, and 1st Lt William C. Fowler, U. S. Army, for Appellee.

### Opinion of the Court

Robert E. Quinn, Chief Judge:

At a common trial with one Hudgins, the accused was convicted as an aider and abettor in a robbery. On the post-trial review, the staff judge advocate noted that the evidence presented a "borderline case" of guilt, but he recommended affirmance. The convening authority affirmed but reduced the sentence, as recommended by the staff judge advocate. A board of review affirmed, without opinion. We granted review to consider the sufficiency of the evidence.

In the early evening of November 27, 1953, Private Joseph went to the town of Chitose, Japan. About two hours, and several tavern visits later, he started back to camp. As he walked down the street, "some guys jumped" him. One hit him in the jaw. He was knocked to the ground. Two persons took his coat and cap. Although he could not generally identify or describe his assailants, he did know that there were five, and they were "all colored." He saw them, "only when . . . [they] were running away." He stayed on the ground for about ten minutes; he could not recall what he did during that time.

In addition to Joseph's testimony, the prosecution's case consisted of a written pretrial statement, in question and answer form, obtained from the accused. He said that he went to town alone.

There, he met some friends whom he knew "only by sight." He joined them. As the group walked down the street, a soldier passed. One of the group "accidently hit the soldier." His statement continues as follows:

"Q. What do you mean accidently hit the soldier?

A. All I know is that one of the guys hit the guy and he fell.

"Q. How many of your group hit the soldier?

A. One.

"Q. What were you doing while one of the men were attacking the the soldier?

A. Nothing.

"Q. Who struck the first blow?

A. One of the colored guys.

"Q. What was said during the fight?

A. All I heard was a few profanity words.

"Q. Who took the cap and over coat?

A. One of the colored guys. I don't know which one.

"Q. What did he do with the coat and cap?

A. One of the guys took the coat to a pawn shop and pawned it.

"Q. Did you go along or did you wait for the man to pawn the coat and return?

A. When the fellow took the coat,

**21**

we all walked down the street, the man went inside of a house and we waited for him he pawned the coat and came out.

"Q. Did you know he was going in to pawn the coat?

A. I thought he was going in to sell the coat. He came out without the coat.

"Q. How much did he get for the coat?

A. I don't know.

"Q. Did he divide the money with any of you?

A. No.

"Q. Did he join the group after he pawned the coat?

A. Yes, then we started on our way."

The accused and Hudgins, his coaccused, testified at the trial. In some respects, the accused's testimony is a reiteration of his pretrial statements. In others, it is different. In the pretrial statement, Johnson had said that he met some friends whom he knew "only by sight." At the trial he stated that first he met Hudgins, whom he knew "from the company" at a beer hall. After a time, he and Hudgins left the tavern. Outside they met "three other guys," whom he did not know. Hudgins, however, knew one of the three, Fischer, as a fellow member of the boxing squad. The five continued down the street together because he and Hudgins had "to go in the same direction . . . in order to get back to the main part of town." On the other hand, Hudgins placed this meeting with the others in the Grace Beer Hall. He became engaged in conversation with other persons, and the trio left. The accused then called to him, and they "caught up" with the others in the street, intending to accompany them to another beer place.

As the group proceeded along the street, they passed Joseph who was going in the opposite direction. Johnson testified that he and Hudgins continued to walk on, but the other three "dropped back." Hudgins also testified that at that time he and the accused were "walking a little ahead" of the others. The "next thing" Johnson knew was

that he looked back and the "soldier was on the ground." He was then about twenty or twenty-five feet away. He saw the other three "crowded around" the fallen soldier. Hudgins also looked around and saw the soldier on the ground. He placed the distance between himself and the group at six feet.

A number of inconsistencies appear in the testimony of the accused and Hudgins. In the course of their testimony both denied that they saw Joseph get hit. However, in his pretrial statement the accused said that "one of the guys" hit Joseph, and that he struck the first blow. And on examination by a court member, Hudgins admitted that he saw King, one of the trio, hit the victim. Again, in his pretrial statement, the accused had said that when the coat and hat were taken from Joseph, he and the others "all walked down the street." Yet, on direct examination, he testified that after the assault, the trio simply ran past him and Hudgins. He saw them turn the corner. They then stopped running and started walking to the pawn shop. He stopped with Hudgins outside a beer hall which was across the street from the pawn shop and asked Hudgins if he wanted a drink. At that point the others came out of the pawn shop, and "caught up" with them and asked them to "walk with us around here." The accused told Hudgins not to go, but Hudgins advised him to return to camp because he had no pass and might get into trouble. As he started to leave, he was apprehended by the military police.

On cross-examination, the accused somewhat varied the testimony given on the direct examination. He stated that after he noticed the trio crowd around the victim, he went down the street "slowly." The others passed him and then stopped. He and Hudgins "got even with them and they [the trio] stopped at a pawn shop . . . and came out with nothing." They came across the street to the accused and Hudgins and one of them asked Hudgins if he wanted any money. Hudgins replied that he "didn't want nothing." They did not ask the accused, because they "didn't know me by name." Hud-

gins told the accused to return to camp because he had no pass. In response to direct questioning by trial counsel, the accused denied that he had acted as a lookout during the incident, or that he had hit the victim or touched his coat or hat.

Further amplification of his conduct appears in the accused's redirect examination. He then testified that when he and Hudgins noticed Joseph on the ground, Hudgins said "Lets go Johnson. I don't want to get in no trouble." Hudgins suggested that they go back to the company, and he agreed. However, when they reached the beer hall across the street from the pawn shop, the others "caught up with us again." When he, Hudgins, and the trio were together before the assault he "heard nothing about hitting."

Hudgins' pretrial statement and his testimony at the trial also disclose inconsistencies and some contradictions. These, of course, cannot be used against the accused. We mention them briefly, however, because they bear upon the weight that the court could give to Hudgins' testimony. In his pretrial statement, he said that during the assault Johnson walked "down the street" but "I stayed there and watched to see if anyone come up." However, at the trial, he denied that he acted as a lookout. His direct examination account of the incident is to the effect that when he and Johnson saw the trio take Joseph's coat, he "didn't want nothing to do with that so I walked up the street." The others passed him in their flight from the scene. He and the accused then continued down the street. They saw the trio go into the pawn shop. He told Johnson to go back to camp because "We don't want nothing to do with King and Thompson and Fischer or any of this stuff. We better go back." Just then the others came up and said to them, "Do you want any yen." Hudgins replied, "I don't want no yen. I have money."

On cross-examination Hudgins testified that the trio left the scene about two minutes before he did. He waited for Johnson, who had walked "about a ½ a block down" the street. He and the

accused saw the others go into the pawn shop. They waited about 10 minutes for them to come out. He wanted to wait for Fischer since "He was going back to camp and Johnson and I was going back. I waited for him because he didn't have any money left." Hudgins maintained that he "didn't figure I would get in no trouble by not taking anything, but I did see it I just didn't turn it in."

It is axiomatic that mere presence at the scene is not sufficient evidence upon which to convict one as an aider and abettor in the commission of an offense. The Government, however, contends that the accused's admission that he was walking with the others when the crime was committed establishes "an affinity of common purpose." We find no merit in this contention. The accused's acknowledgement of his presence does not imply that he had entered into an agreement with the others to assault or to rob. Certainly, there is no direct evidence of any such agreement. Both the accused and Hudgins denied any such agreement; and there is insufficient evidence from which to infer its existence.

True, Hudgins' pretrial statement contains a number of incriminating admissions, but again we note that these cannot be used against the accused. United States v. Wooten, 1 USCMA 358, 361, 3 CMR 92. It is also true that there are some internal inconsistencies in both accounts of the incident, as well as disagreements between the two. But the consistent core of their testimony is that they had no agreement or concert with the perpetrators of the crime. Both the accused and Hudgins testified that they were ahead of the trio when they first noticed the assault. The accused said that he immediately walked away and Hudgins substantially corroborated him. It is significant that the accused was not offered any part of the proceeds of the crime. Hudgins' testimony suggests that he and the accused were asked by the trio if they wanted some yen, but the form of his reply clearly indicates that the question was addressed only to him. The accused's testimony is directly to that

effect. Had there been an actual agreement or concert of purpose between the accused and the others, it seems reasonable that they would have tendered him a specific part of the proceeds. In the form in which it was actually made, the offer of money to Hudgins clearly indicates that the others did not consider the accused a part of the group. Why then should the offer have been made at all? It is quite likely that it was made because the trio wanted to insure silence. As Hudgins put it, they had seen the crime committed, but they did not report it.

In the absence of circumstances from which it may reasonably be inferred that the accused acted in ▆▆▆▆▆ concert with the others, his conviction can be supported only if it appears that he gave aid and encouragement to the perpetrators of the crime, and that he shared in the criminal design of the wrongdoers. According to the victim he saw five persons "running away" after the robbery. Flight is, of course, an indication of consciousness of guilt, but its probative effect "depends ▆▆▆▆▆ on the conditions and motive which prompted it." Vick v. United States, 216 F 2d 228, 232 (CA 5th Cir) (1954). The accused testified to the motives which prompted him. He said that he left the scene because he and Hudgins did not want to get into trouble. In that he is corroborated by Hudgins. When we consider that the accused did not know the trio and had only just been introduced to them, his desire to avoid implication in the sudden assault on a passerby is reasonable and instinctive. Under the circumstances, therefore, flight is as consistent with innocence as it is with guilt. In speaking of the effect of flight under such circumstances, the Court of Appeals of the State of New York said:

"... Ordinarily it is of slight value, and of none whatever unless there are facts pointing to the motive which prompted it, and hence any explanation of the accused should always be considered in connection therewith." [People v. Fiorentino, 197 NY 560, 568, 91 NE 195.]

After careful consideration of the evidence, we conclude that it is insufficient to support the conviction. The inferences to be drawn from the facts are as consistent with innocence as they are with guilt. The evidence, therefore, cannot be said to establish the accused's guilt beyond a reasonable doubt. Vick v. United States, supra. Accordingly, the findings of guilty and the sentence are set aside, and the charges are ordered dismissed.

Judge BROSMAN concurs.

LATIMER, Judge (concurring in the result):

I concur in the result.

I fail to find any relevancy in that part of the Court's opinion which discusses the inconsistencies in the testimony of certain witnesses. Assuming a contradictory witness can be disbelieved by the court-martial, that does not concern us in this instance. Here, when the testimony of record is interpreted in a light most favorable to the Government, there is no evidence to establish that this accused aided, abetted, counselled, commanded, or procured the commission of this offense in any way. United States v. Guest, 3 USCMA 147, 11 CMR 147.