UNITED STATES, Appellee

v

ALAN T. CALDWELL, Master Sergeant, U. S. Air Force, Appellant

11 USCMA 257, 29 CMR 73

■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■

No. 13,446

Decided February 19, 1960

■■■■■■■■■■■■■■■■■■■■■

*Captain Norman K. Hogue* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel James L. Kilgore.*

*Lieutenant Colonel Francis R. Coogan* argued the cause for Appellee, United States. With him on the brief was *Colonel John F. Hannigan.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

This record reflects many unfortunate trial incidents which indicate a throwback to the time when presidents of courts-martial were in charge of the court proceedings and ran them without brooking interference by other court personnel. Furthermore, it shows a display of irritation by a senior officer who made ill-timed remarks and openly expressed his disgust with the law and the method of procedure directed by the law officer. Unfortunately, when the courtroom atmosphere is contaminated with that perversity, there is no chance for a fair and just hearing and this case is adequate proof of that point.

We need not go into details as to the various in-court events, for one alone requires that we reverse the findings and sentence. The facts relevant to this occurrence are these. Both sides had concluded their final arguments when the president suggested to the law officer that it would be a convenient time to recess for supper. It was then 7:28 o'clock on a Saturday evening, and the members were to reassemble at 8:15 p. m. When the court reconvened at the appointed time, the law officer commenced his instructions to the court, but he was forthwith interrupted by the president, who wanted to know if the court members were to be furnished the instructions in written form to be used during the secret deliberations. When informed in the negative, the president stated, "Then we better take it [the charge] down verbatim." As the law officer continued on with his instructions, he was continually interrupted by questions interposed by the court members and directions to read more slowly. After he had completed his preliminary instruction on two specifications and was stating the elements of the offense charged in a third specification, a colloquy occurred over the meaning of some of the terms used by him and to research the law he announced a short recess. When the court

■■■■■■■■■■

reassembled, the president made the following announcement:

"PRES: It seems now, to preclude unnecessary opening and closing of the court that all of these specifications or elements of proof should be written down verbatim. It is a question of who is the fastest writer of the five. It is needless to have five separate notes on something that might prove conflicting.

"Anybody have an idea who is the fastest writer of the five of us? I see no sense in five of us taking all of this verbatim. One man can take it down and we then have an authority. If we don't do that I don't see anything but to open the court again and get these from the law officer as to what constitutes elements of proof.

"(No response)

"I will then decide. Ernie, will you take each instruction as he gives it verbatim.

"CAPT GEISENDORFF: That is starting with specification 3.

"PRES: By 'verbatim' I mean word for word."

As a result of this direction, which resulted in a number or interruptions, the law officer required two hours and sixteen minutes to give his charge. Consequently, and because the court interrupted its deliberations in order to have certain testimony repeated, it was after 2:00 o'clock Sunday morning when the court returned with the findings of guilt, and it was after 5:00 a. m. the same morning when sentence was announced. While counsel for the accused willingly consented to go on, we look with a jaundiced eye upon the judgment of a presiding officer who subjects court members, counsel, and witnesses to such punishment.

The Government points to a statement by the president that he was actuated by his genuine interest in protecting the rights of the accused, but we conclude that his self-asserted paternalism had the opposite effect and denied the accused a fair trial and an adequate appellate review. While perhaps not anticipated, as a result of his direction, the members had with them in their closed session the writings of Captain Geisendorff, but they were not retained and attached to the transcript of the testimony or otherwise made part of the record. Accordingly, we are unable to ascertain the contents of a writing used by the court members in a secret session. That omission becomes significant, for the record shows uncertainty over the principles announced by the law officer in some of his instructions and the questions asked in connection with their meaning leads us to believe that a person attempting to record the instructions accurately in longhand, as they were modified by explanations, would be faced with well nigh insurmountable difficulties. But more important, Article 54(a) of the Code, 10 USC § 854, requires that a general court-martial keep a separate record of the trial of each case before it, and the Manual directs that the record reflects all proceedings which occur in open court. Paragraph 82b (1), Manual for Courts-Martial, United States, 1951. See also Article 39, Uniform Code of Military Justice, 10 USC § 839. One of the essentials of trial which must be recorded are the instructions given by the law officer. Here those read by the law officer were in fact recorded, but those penned by the court member have not been saved. We are, therefore, confronted with a situation where an unrecorded communication was used by the court members in secret session. The rule governing that situation is expressed in United States v Lowry, 4 USCMA 448, 16 CMR 22. In that case the law officer furnished the court members with certain citations of cases to be read by them, if desired. The record did not show what authorities were cited to the court members, and that omission required a reversal of the findings and sentence. Part of the reason for that disposition is found in the following language quoted from the opinion:

"If the accused objected to the submission of the cases to the court, he should, of course, be entitled to have an appellate tribunal pass on the legal correctness of the contents of those cases in relation to the facts of this

case. See: United States v Chaput, supra. Here, he is deprived of that substantial right by the deficiencies in the record. On the other hand, if the accused was unaware of the reference, the submission of the cases would be tantamount to a private communication between the law officer and the court. A communication of that nature is presumed to be prejudicial. United States v Adamiak, 4 USCMA 412, 15 CMR 412. The presumption may be overcome by a 'clear and positive showing' that the improper communication did not, in any way, influence the decision. However, there is no indication of this. Not one of the cases has been made known to us. It may well be that the facts recited in them had considerable influence upon the court. But, we are not required to speculate. The presumption of improper influence has not been overcome. Cf. United States v Walker, 3 USCMA 355, 12 CMR 111."

Here, as there, the accused was deprived of his right to have the board of review or this Court pass on the propriety of the information actually considered by the court members. Naturally, the Government ▇ would like us to conclude that they used the identical instructions which are transcribed in the present record, but we are not disposed to go that far. To do so would require us to speculate on the capabilities of the Captain to fill the role of a court reporter. Experience teaches us that many inaccuracies creep in when oral pronouncements are taken down in longhand, and it is not shown that the Captain-recorder appointed in this case possessed the expertise to record the proceedings. As a matter of fact, the record indicates he was unqualified to perform the task of a court reporter, and we cannot presume regularity in his handicraft, for at best he was acting in an unofficial capacity. He could hardly be considered an ▇ adequate substitute for the sworn reporter, and the document written by him and used by members in the closed session of the court must be considered as an unlawful communication. Such being the case, the communication is presumed to be prejudicial to the accused and the burden is cast upon the Government to overcome that presumption by clear and convincing evidence. The Government has failed totally to assume that burden in the case at bar.

It is argued by the Government that having one member prepare a memorandum for the use of all members of the court is better than having five officers refer to their own notes. The best answer to that argument is found in the president's complaint to the law officer. He stated:

"PRES: That is the only reason for my lengthy detaining of you and asking one member to take these elements of proof down verbatim. I see no reason for five separate sets of notes which would result in a hodgepodge, different wording, and ultimately bringing about confusion as to what constitutes the elements of proof, and needless and frequent resumption of open court in order to get instructions by you. I strongly feel they should be placed before this court in writing and verbatim, and they have been so done."

In other words, what the president said is that if there was a dispute on any instruction, the court members would have a master copy of the charge available which they could use to settle all controversies. That reasoning, which is echoed by the Government, fails to appreciate the prejudice which may result to an accused if the one writing is inaccurate; it overlooks his right to object to any inaccuracy in the instruction relied upon to settle the differences; and it neglects to consider his privilege to submit corrective instructions. Normally, if there is any disagreement between members on the law, the court is opened and the matter is called to the attention of the law officer, who is able to clarify the uncertainties in the presence of accused and his counsel. When that method is followed, the accused is afforded an opportunity to be heard on the additional advice. The procedure adopted by this

president disregarded the normal method of running a court, and ■ it should not be used but, assuming that written instructions are prepared by the law officer and a copy taken into the secret session, there is a duty on the part of the Government to have them made part of the record on appeal. In that connection, it is to be remembered that if written instructions are available to the members to guide them in their deliberations, they would be most influential, for members would rely on them for guidance rather than trust to their memories. It, therefore, follows that whatever writing is furnished to the court-martial must be included in the record. In the instant case, the failure to furnish a complete record of the proceedings renders it impossible for us to determine whether there was actual harm to the accused in the use of the writings of the Captain. That calls for the application of the doctrine of presumptive prejudice. Since the Government has failed to overcome that presumption, accused's conviction cannot stand.

The decision of the board of review is reversed.

Chief Judge QUINN and Judge FERGUSON concur.