UNITED STATES, Appellee

v

EDSEL R. FORD, Private First Class, U. S. Army, Appellant

12 USCMA 31, 30 CMR 31

No. 14,123

Decided December 2, 1960

*First Lieutenant Ira M. Lechner* argued the cause for Appellant, Accused. With him on the brief were *Major Ralph W. Wofford* and *First Lieutenant Leonard Etz.*

*First Lieutenant Alvin B. Fox* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel James G. Mc-Conaughy.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

We granted review in this case to consider the accused's contention that the evidence is insufficient to support his conviction for stealing, in conjunction with several fellow soldiers, two Government typewriters, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921.

Some "combat serviceable" typewriters were stored in a warehouse known as Building 111, Fort Carson, Colorado. The warehouse was located in the "extreme north section" of the installation, in what was described as the railhead area. An inventory count confirmed record entries showing the typewriters were in stock. Not long thereafter, it was discovered that two of the machines were missing. Investigation indicated that the accused and several others were implicated in the suspected theft. The accused gave a voluntary statement to a criminal investigation agent. The statement constitutes the only evidence of the accused's connection with the case. The accused contends it shows he was but a "mere onlooker" at the scene and innocent of guilt. On the other hand, the Government maintains the statement shows the accused gave active aid and encouragement to the wrongdoers, and that he is, therefore, equally punishable with them. See Article 77, Uniform Code of Military Justice, 10 USC § 877.

Before considering the details of the pretrial statement, it is appropriate to comment briefly on appellate defense counsel's intimation that part of the accused's testimony in mitigation explains away certain "imperfect" inferences that might otherwise be drawn from recitals in the statement. Evidence in mitigation may indicate that a previously entered plea of guilty is improvident because it was not based on applicable law or the actual facts. However, questions of fact decided by the court-martial on the basis of the evidence submitted to it are adjudicated facts and, for appellate purposes, must be accepted as true. Mitigation testimony, whether sworn or unsworn, does not minimize the legal force of the adjudicated facts. In an appropriate case, such testimony may perhaps justify a new trial in the interest of justice, but it does not destroy the evidentiary basis upon which the court-martial reached its findings of guilty. Consequently, aside from the question of a new trial, which is not raised in any way by this appeal or by the record of trial, a challenge to the sufficiency of the evidence to support the findings of guilty must be determined only on the basis of the evidence admitted on the merits. This is the only evidence considered by the court-martial in reaching its findings, and it is the only matter from which the correctness of its decision may be determined. United States v Swanson, 9 USCMA 711, 716–717, 26 CMR 491.

Turning to the pretrial statement itself, the accused said that he and private Davis were on Security Patrol during the hours from Midnight to 7:00 a.m. Part of their responsibility was "to check certain buildings" in the warehouse area. They came upon a building, the door of which was "split almost in half." Davis went into the building "to see if anyone was in it," while the accused remained outside in their jeep, "in case anyone called on the radio." Parenthetically, it should be noted that other evidence estab-

lished that security patrols are instructed to report to the desk sergeant "if they find a building open or if they are in trouble." No such report was received from the accused. What transpired when Davis emerged from the building is best told in the accused's own words:

"He came out and we left and checked our other buildings. We went to the M. P. Station for coffee call. After coffee call, we met the Post Patrol which was SP4 BAILEY and Pfc RICHMOND. Pvt DAVIS told them about the building being open. We told them to come on down and look at the building. They followed us and we drove back down to the warehouse. BAILEY and I stood outside and talked. RICHMOND and DAVIS got out and went into the warehouse. DAVIS and RICHMOND came out of the building and I believe each one was carrying a portable typewriter and case. DAVIS got in the jeep with me and RICHMOND got in the jeep with BAILEY. We drove to some kind of a NCO training area and stopped. They started talking about the typewriters and BAILEY said he would like to have one. I said I didn't want any. DAVIS gave BAILEY one of the typewriters and RICHMOND kept the other. We then continued our patrol."

Mere presence at the scene does not make one liable as a participant in the crime. As we said recently, there "must be some action on the part of the . . . [person] which encourages or assists the active perpetrators and there must be a showing of a common purpose to accomplish the criminal design." United States v McCarthy, 11 USCMA 758, 761, 29 CMR 574. Appellate defense counsel contend that the facts in this case are substantially like those in *McCarthy,* and that our dismissal of the charge of larceny in that case requires dismissal of the charge here. They argue that a police officer who sees a crime in the course of commission, and does nothing to prevent its completion or to apprehend the offender, may be guilty of malfeasance in office, but he is not guilty of the particular offense committed in his presence. See Collins v United States, 65 F2d 545 (CA 5th Cir) (1933). The argument, however, is based upon too narrow a reading of the accused's pretrial statement, and too sweeping a joinder of the instant facts with those in the *McCarthy* case.

In *McCarthy,* the evidence established that arrangements for use of the accused's car for a wholly innocent purpose were made "before the plan to steal was broached"; that before the theft, the accused *specifically admonished the culprits* "not to do it"; and that after the theft *he had no knowledge* of the act. We pointed out that, among other things, the accused's "advice . . . militate[d] against any inference that he joined" in the criminal design. We concluded that the evidence showed "mere failure . . . to interfere with the conduct" of others, without the conscious sharing of the criminal intent of the perpetrators which the law requires. The opposite of each of these circumstances is present in this case.

After discovering the broken door of the warehouse, the accused returned to the military police station. He did not, however, report the matter as he was required to do. Instead, he informed Bailey and Richmond, who were on Post Patrol, that the building was "open." From the record, it is reasonably inferable that the Security Patrol, not the Post Patrol, was primarily responsible for security of the warehouse. Why then did the accused tell Bailey and Richmond about the building? Why should he, as he said, invite them "to look at the building"? Why should he leave the area which he was then patrolling to lead them to an out-of-the-way warehouse which he had already checked out? From what transpired at the warehouse the court-martial could reasonably find that his purpose was not an innocent one. Immediately upon arrival, a member of each patrol went into the warehouse; both came out carrying a typewriter. That the

**33**

accused expected they would emerge with some kind of property is reasonably inferable from the fact that neither he nor Bailey uttered a word of protest or asked for an explanation. Instead, they at once proceeded to another area. The accused's statement fairly indicates this area was deserted. Here, they discussed a division of the property taken from the building. True, the accused rejected a share, but the court-martial could reasonably find that his rejection was predicated upon the inutility of the typewriters to him. Whatever the accused's reason for giving up a share in the property, however, his pretrial statement shows clearly that he was no mere witness to the crime. He left his patrol to lead the thieves to the warehouse; he permitted them to enter the warehouse through the broken door. When they entered, at least one was secure in the knowledge that while the accused had had ample opportunity to do so, he had not reported the "open" door to the desk sergeant, as he was required to do; that without hesitation or expostulation, the accused drove off with the thieves to a deserted area where he discussed with them disposition of the stolen property. In our opinion, the evidence amply supports the conclusion that if the accused did not actually participate in the crime, he at least actively encouraged its commission. Collins v United States, supra.

The decision of the board of review is affirmed.

LATIMER, Judge (concurring):

I concur.

As the Chief Judge points out, the evidence in the case at bar reasonably supports the conclusion that accused actively aided and abetted the perpetration of this theft. See Article 77, Uniform Code of Military Justice, 10 USC § 877. Accordingly, I join him in affirming the decision of the board of review. A further expression of my views on the law in this area may be found in United States v McCarthy, 11 USCMA 758, 29 CMR 574.

34

FERGUSON, Judge (dissenting):

I dissent.

As the author of the concurring opinion implies, this case reverses our decision in United States v McCarthy, 11 USCMA 758, 29 CMR 574, and adopts a rationale there expressly rejected by myself and the Chief Judge. For myself, I am of the view that what constituted good law in August is yet valid in December—a fact accorded recognition by the Government's studious refusal to mention *McCarthy*, supra, in its brief despite the well-reasoned contention of appellate defense counsel that it controlled here. Indeed, this accused's case is much stronger, for the Government *concedes that he knew nothing of the theft until the actual perpetrators completed the removal of the typewriters from the warehouse and that his guilt must be predicated on his later failure to report the theft to his superiors and his transportation of one of the thieves and machines away from the locus of the crime.*

The evidence clearly establishes that two typewriters were stolen from an Army warehouse at Fort Carson, Colorado, by Davis and Richmond. The sole proof which was utilized to connect the accused with the offense was his pretrial statement, which admitted the following:

"Around the end of August 1959, I was on Security Patrol with Pvt DAVIS. We checked all of the buildings we were supposed to check. We were on duty from 0001 to 0700 hours. We found a big sliding door in the warehouse area that was split almost in half. This building was in the last row going towards the trailer courts. We were going to check the buildings out to see if anyone was in it. DAVIS went inside and I pulled the jeep up along side of the building in case anyone called on the radio. He came out and we left and checked our other buildings. We went to the M.P. Station for coffee call. After coffee call, we met the Post Patrol which was SP4 BAILEY and Pfc RICHMOND. Pvt DAVIS told

them about the building being open. We told them to come on down and look at the building. They followed us and we drove back down to the warehouse. BAILEY and I stood outside and talked. RICHMOND and DAVIS got out and went into the warehouse. DAVIS and RICHMOND came out of the building and I believe each one was carrying a portable typewriter and case. DAVIS got in the jeep with me and RICHMOND got in the jeep with BAILEY. We drove to some kind of a NCO training area and stopped. They started talking about the typewriters and BAILEY said he would like to have one. I said I didn't want any. DAVIS gave BAILEY one of the typewriters and RICHMOND kept the other. We then continued our patrol.

"Q: When was the next time you was [sic] with someone who went in this bldg?

"A: I have never been back down there.

"Q: How much education do you have?

"A: Graduated from High School.

"Q: Who all has taken property from this warehouse?

"A: I don't know.

"Q: Have you made any attempts to report this incident to your superior?

"A: No."

A comparison of these facts with those in United States v McCarthy, supra, indicates that they are in all material respects identical. In that case, Lieutenant McCarthy was present with the two enlisted principals to the crime at an off-post cafe. When the trio left to return to their station, the enlisted men suggested stealing hubcaps from a nearby Buick in order to replace those missing from McCarthy's vehicle. McCarthy demurred. Nevertheless, the men removed the hubcaps while the lieutenant remained in his automobile. The stolen items were then placed in McCarthy's car and transported to another cafe where they were finally discarded.

In the instant case, the accused and his partner Davis, during a routine patrol as military policemen, observed a damaged door on a post warehouse. They checked the area and found nothing suspicious. Thereafter, they obtained coffee at the Military Police Station and resumed their patrol. Meeting other military policemen on the Post Patrol, they returned jointly to the warehouse, where Davis and Richmond entered the building. As the Government concedes, there was no plan to steal from it and accused knew nothing of any theft until Davis and Richmond returned to the vehicle with two typewriters. Accused and his partner Davis then re-entered their jeep and followed the other patrol to another area of the post. There, accused was offered one of the stolen machines. He refused, stating, "I didn't want any." He did not report the incident to his superiors, although he was required by pertinent directives to do so.

It will be seen from the foregoing that Lieutenant McCarthy was expressly made aware of the impending theft prior to its occurrence, whereas this accused admittedly was not so informed until the property had been removed from the warehouse. If inactive presence on the scene coupled with prior knowledge of the planned offense is insufficient to make one an aider and abettor, ignorantly remaining by one's vehicle surely cannot be made the basis for such an inference. Nor can the accused's later transportation of his partner, Davis, and the typewriter offer any basis for a conclusion that he assisted in the commission of the crime. As we noted in *McCarthy*, supra, the defendant there remained on the scene and knowingly removed both the thieves and the hubcaps to another cafe where the loot was thrown away. Of that circumstance, we said, at page 762:

". . . In like manner, the fact that Allman, Lindow, and the hubcaps left the scene in McCarthy's car offers scant support to the Government. The arrangement for the ride to Fort Knox had been completed before the plan to steal was

35

broached and to hold that McCarthy's subsequent transportation of the thieves and the hubcaps establishes his participation in the theft converts mere continued inactive presence at the scene into a positive sharing in the felonious conduct charged. While such may have rendered him an accessory after the fact, it is little more than another way of saying that accused's nonfeasance is sufficient to allow an inference that he joined in the criminal purpose of Allman and his confederate."

Here, the accused and his partner shared the duty of operating in a patrol vehicle. Their use of this method of transportation had long since been settled by those who assigned them to a motor patrol, far in advance of the larceny. When accused departed from the scene with Davis and the typewriter, he did nothing more than to extend to his partner on patrol the right which Davis possessed by reason of their joint assignment. In short, to draw an inference of aiding and abetting here is even less reasonable than in *McCarthy*, supra, where the automobile was the accused's private property and solely under his control.

Moreover, one need not rely solely on *McCarthy*, supra, for the conclusion that the subsequent transportation of the thief is immaterial. In United States v Jackson, 6 USCMA 193, 19 CMR 319, at page 201, the Chief Judge declared:

"The law of aider and abettor is not a dragnet theory of complicity. *Mere inactive presence at the scene of the crime does not establish guilt. . . . Neither does later approval of the act supply a ground for conviction. . . . The law requires concert of purpose or the aiding or encouraging of the perpetrator of the offense and a conscious sharing of his criminal intent.*" [Emphasis supplied.]

See also United States v Lyons, 11 USCMA 68, 28 CMR 292, wherein we held that acceptance of a bribe "to see nothing" by a sentinel from an active participant in larceny was insufficient to establish the accused's "conscious sharing of the alleged intent of the co-actors." United States v Lyons, supra, at page 71.

The only circumstance left from which it is sought to infer guilt is the fact that accused failed to perform his duty as a military policeman and report the theft to his superiors. Indeed, that is the theory upon which the case was tried and submitted to the court-martial, and it is the argument of the United States at this level. It also is a contention which we have twice rejected. Thus, in United States v Schreiber, 5 USCMA 602, 18 CMR 226, we noted that the failure of air policemen to act, in accordance with their duty, to prevent a homicide did not make them principals in the murder but constituted each such policeman, at the most, only an accessory after the fact. And again in the *McCarthy* decision, we stated, at page 762:

". . . Suffice it to say that we are not willing to permit findings of guilty of larceny to rest upon a mere failure of the accused to interfere with the conduct of his subordinates under the circumstances here depicted. *To hold otherwise would require us to conclude that a policeman who merely observes the commission of a crime and does not intervene thereby becomes a coparticipant if the actual criminals know they are being observed and do not permit that fact to deter them.*" [Emphasis supplied.]

One other area of the principal opinion deserves comment. Mention is made of the accused discovering the damaged warehouse door during his initial patrol. Later on, much is inconsistently made of the fact that he "left his patrol" and the area "he was then patrolling" to lead the thieves to the warehouse. Common sense dictates that accused was on his proper route when his patrol discovered the condition of the door. Thus, it is clear that he did not depart from it when he returned with the Post Patrol.

Moreover, it is equally established and indeed, elsewhere stated in the opinion, that the accused, Davis, Richmond, Bailey, and the vehicles of both patrols proceeded to the warehouse. How the accused can be said to have "left his patrol" is thus beyond comprehension.

Finally, it is stated to be "reasonably inferable" from the record that accused's patrol, "not the Post Patrol," was primarily responsible for the warehouse's security. No basis is set forth for that conclusion, and there is a good reason for the omission. The record is simply devoid of any evidence allowing the inference to be drawn. Indeed, if the responsibility is material and a choice must be made, it would seem to fall upon the "Post Patrol" rather than upon accused's unit which appears to have been a tactical entity quartered at the military station involved.

Further discussion of the purported distinctions between this case and those which we have heretofore decided is of little utility. The simple answer to the entire argument is that these matters were all disposed of in United States v McCarthy, supra, and that decision should rule here. The light departure from precedent undertaken in the principal opinion means that we are holding an enlisted military policeman to a standard of conduct vastly higher than that required of a mature first lieutenant. To some, that sort of proposition may appeal. I simply believe that it marks another variation from the basic concept of Government under settled principles of law in favor of man-made and man-decided beliefs concerning "justice." I predict that the Government will have little cause to rejoice over the result here, for the pendulum will surely swing the other way in the future when the same facts are presented to us in "a different light." They will, of course, derive comfort from the support which this decision adds to their oft-heard complaint concerning the instability of military case law.

I would reverse the decision of the board of review and order the Charge and its specification dismissed.