[7] Cf. United States v Rake, 11 USCMA 159, 28 CMR 383.

UNITED STATES, Appellee

v

GLEN W. SANDERS, Private First Class, U. S. Army, Appellant

14 USCMA 524, 34 CMR 304

No. 17,314

May 1, 1964

First Lieutenant *Beverly B. Bates* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk, Captain Daniel H. Benson, Captain Joseph M. Livermore,* and *Captain Gary G. Keltner.*

*First Lieutenant Robert T. Webster* argued the cause for Appellee, United States. With him on the brief were *Colonel Bruce C. Babbitt* and *Lieutenant Colonel Francis M. Cooper*.

## Opinion of the Court

KILDAY, Judge:

The accused was found guilty by general court-martial of assault with intent to commit rape, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. He was sentenced to a bad-conduct discharge, total forfeitures, confinement at hard labor for one year, and reduction to the lowest enlisted grade. The convening authority affirmed only findings of indecent assault but approved the sentence. An Army board of review affirmed the reduced findings and sentence.

We granted accused's petition to consider an allegation of error by the law officer in his instructions and the possibility of prejudice arising out of an indication that the court-martial had an unofficial and unrecorded copy of the instructions in closed session.

In order to place these issues in proper focus, a brief recitation of the facts is in order.

The victim, a German national, was returning home along a street in Bad Hersfeld, Germany, when she was grabbed from behind and her mouth and eyes covered. As she turned her head she saw a man in dark clothing, later identified by her as the accused, standing behind her on the left side. He did not participate in the initial assault—but rather she was grabbed by a person in light clothing. She was then pushed between parked cars and collapsed upon receiving a blow to the kidneys. When she regained consciousness she was being struck about the face by her initial assailant. The accused, she testified, was crouched to the left of her feet and "he was grabbing me under my coat and skirt and tried to take my panties off." Suddenly the two men ran away.

Upon cross-examination, the witness admitted having told the German police one-half hour after the incident that she didn't know which of the men had grabbed underneath her skirt. She stated that she later recalled everything that went on.

Another prosecution witness, also a German national, heard the victim's call for help. He started toward the direction of the screams and saw the accused duck into a passageway. He followed and flashed a light on the accused and asked him to go with him to the place of the incident. Appellant voluntarily complied and when the victim saw him she told the witness that "he was one of them."

In his pretrial statement and in his testimony at trial, the accused disavowed any complicity in the offense. He stated he was with Private T. when the latter grabbed the girl and dragged her between the cars. He tried to get T. off the girl and the only time he touched the victim was when he grabbed her hand thinking it was T.'s. When someone came along he became scared and ran but returned because he wanted to "see if she was hurt."

Also for the defense, Mrs. R. testified that as she was walking down the street she saw two men and a woman ahead of her. They appeared to be a group. As she walked a little further they got behind a circular advertising pillar and then she heard loud voices as if in argument. As she drew near she saw the woman on the ground and a man in white kneeling alongside the girl and hitting her. The man in dark clothing was just standing there. She called out and they both ran away. At no time did she observe the man in dark clothing take any part in the affair.

In rebuttal, the prosecution called Private T. who testified that it was his idea on the spur of the moment to attack the victim. There was no previous discussion of the event. T. admitted grabbing the victim and striking her but denied any attempt to remove her underclothing. He saw the

**526**

appellant kneel down by the girl but never saw him put his hands on her. He also testified that Sanders never attempted to pull him away.

In his instructions to the court, the law officer included therein an instruction on the law of aider and abettor:

". . . To constitute one an aider or abettor, and hence liable as a principal, he must share the criminal intent or purpose of the active perpetrator of the crime and must by his presence aid, encourage, or excite the active perpetrator to commit it. Mere presence at the scene of the crime is not enough. The proof must show that the aider or abettor did in some way associate himself with the venture, that he participated in it as something he wished to bring about, and that he sought by his action to make it successful. If there is a concert of purpose to do a given act, and such act is done by one of the parties, all probable results that could be expected from the act are chargeable to all parties concerned; but in order to make one liable as a principal in such a case, it must be an offense likely to result as a natural and probable consequence of the offense directly intended.

"Consequently, if you are satisfied by legal and competent evidence beyond a reasonable doubt that Private First Class Glen W. Sanders either did, aided or abetted the commission of any offense with which he is charged, you should find him guilty, even though he may not, in this particular case, be the active perpetrator of the crime."

Upon completion of the instructions and prior to the closing of the court, the president inquired:

"PRES: Mister Law Officer, would it be appropriate to ask, in relationship to non-interference. Present but not interfering.

"LO: I think the instruction is sufficiently clear, sir, that if he is just present at the scene of a crime, and in accordance with the instructions, does not interfere, he cannot be held as a principal or as an aider and abettor. As the instruction says, 'Mere presence at the scene of a crime is not enough.' I will re-read that instruction if you like.

"PRES: No, I believe that is clear.

"LO: Questions by any member of the court?

"PRES: None, sir.

"LO: Very well, the court will be closed, sir."

An hour and fourteen minutes later the law officer was called into the closed session. Upon determining that the court had not yet arrived at a verdict, he directed the reopening of the court. The following then transpired:

"PRES: The court will come to order.

"TC: Let the record reflect that all parties to the trial who were present when the court closed are again present in court.

"LO: Let me ask you, for the record, sir, you have some questions to ask.

"PRES: Yes, sir. We request a further definition or explanation. This is the question that we would like to have considered in open court. Could a lesser offense such as indecent assault or assault and battery be accomplished without assisting the action of T . . . in attempting rape?

"LO: You had the instruction on the aider and abettor. If he didn't do it himself the only way you could find him guilty is under the aider and abettor theory, that he aided or assisted in doing it in someway. I will read the instruction again, that is the best I can do unless you want to ask some specific question. If the man is the principal he does the act himself or that he intended to do it, or that he aided or abetted the other man in someway in accordance with that instruction that I have given you. Some of the words may be confusing. It says, 'Likewise, any person who aids and abets.' abets is a very broad term, 'the commission

of an offense is also a principal and equally guilty of the offense. To constitute one an aider or abettor, and hence liable as a principal, he must share the criminal intent or purpose of the active perpetrator of the crime and must by his presence aid, encourage, or excite the active perpetrator to commit it. Mere presence at the scene of the crime is not enough.' Now, this may also be applicable. 'However, if a person who witnesses the commission of a crime had a duty to interfere and his non-interference was designed by him to operate and did operate as an encouragement to or protection of the perpetrator, he is a principal. The proof must show that the aider or abettor did in some way' in a broad term 'associate himself with the venture, that he participated in it as something he wished to bring about, and that he sought by his action to make it successful. If there is a concert of purpose to do a given act, and such act is done by one of the parties, all probable results that could be expected from the act are chargeable to all parties concerned; but in order to make one liable as a principal in such a case, the offense committed must be embraced by the common venture or it must be an offense likely to result as a natural and probable consequence of the offense directly intended.'

"That is about the best I could do for you.

"PRES: Sir, would you repeat that statement that starts, 'Had a duty to interfere . . .' please.

"LO: 'However, if a person who witnesses the commission of a crime had a duty to interfere and his non-interference was designed by him to operate and did operate as an encouragement to or protection of the perpetrator, he is a principal.'

"DC: The defense specifically requests an instruction that the posture of the evidence in this case, this accused did not have a duty to interfere, that is our defense.

"LO: Prosecution.

"TC: Would you repeat that again, please, Mister Defense Counsel.

"DC: An instruction is requested by the accused, in light of the posture of the evidence in this case, issues raised by the evidence, he did not have a duty to interfere.

"LO: On what basis would you say that?

"DC: My understanding of the law officer is; if he just stands there and takes no part as an aider or abettor, ordinarily would not have a duty to interfere, a legal duty, that is my observation. I am not talking about moral obligation.

"TC: Considering the evidence offered by the prosecution, which is before the court, would establish the fact that he did initially act in this venture, having initially started it, starting this venture or making it possible. I think he did have a duty to interfere and I am opposed to the instruction requested by the defense. I think the instructions given by you, sir, are sufficient.

"LO: I don't think I can answer your question, Colonel, I think you must stand on the instructions as I have given it to you. However, I would think, ordinarily, he would not not have a duty to interfere, ordinarily. He is not a law enforcement officer. However he did . . . Well, he didn't know what was going to happen, so, I would say, no, he did not have a duty to interfere under this instruction.

"TC: Mister Law Officer, I take exception with the word . . . .

"LO: You can take exception with what you want to. I don't care what you take exception to. He said that he didn't know what was going to happen, therefor [sic] he had no duty to interfere. In other words the testimony as I see it was, it was a spur of the moment act as testified by T . . . , if you believe that, if you believe that the accused didn't know what was going to happen at the time, under the specific instruction that I am talking about

he did not have a duty to interfere, and, of course, his testimony was . . . , his testimony is not controverted, according to his testimony, whether you believe it or not, if you seek to believe his testimony, his testimony is that he did attempt to interfere. What he did after that has no bearing on the case as I see it. Now, this is about the best instruction that I can give you at this point.

"Does any member of the court have any questions?

"MAJOR DOUGHERTY: May I read back to you a quote of one instruction to see if I understand it correctly?

"LO: Yes, you may.

"MAJOR DOUGHERTY: 'If you believe the accused did not know what was going to happen then he did not have a duty to interfere.'

"LO: He wouldn't under those circumstances have a duty to interfere.

"MAJOR DOUGHERTY: Thank you, sir.

"LO: In other words it is something that happened all of a sudden and it wasn't . . . , if this is what happened, this is all supposition and assumption, but when he realized what was going to happen, and his testimony is that he did attempt to interfere, that he confided [sic] in everything he was required to do, if, and as I said, the credibility of this matter in [sic] whether you believe it or you don't believe it is entirely up to you members of the court. You must determine within the instructions whether he is an aider and abettor or whether he is not, that is the problem before you. Now, I do think since there is all this argument that I should give you one further instruction on voting, and that is:

"A finding of not guilty results as to any specification or charge if no other valid finding is reached; however, the court may reconsider any finding before it is formally announced in open court.

"So if you understand the percentage of people necessary and you cannot reach a valid finding of guilty the finding must be not guilty.

"Is that understood by all members of the court?

"(All members of the court nodded in the affirmative.)

"LO: Very well, the court will be closed."

Twenty minutes later the court reopened and announced its finding of guilty as charged.

It is at once apparent from the nature of the above discussion that the rather lengthy deliberation of the court, prior to its reopening for instructional clarification, was occasioned by its uncertainty over the nature of accused's responsibility by reason of his presence at the scene. Despite the fact that they had been quite properly instructed on the law of aider and abettor (Nye & Nissen v United States, 336 US 613, 93 L ed 919, 69 S Ct 766 (1949); Article 77, Uniform Code of Military Justice, 10 USC § 877), and twice told that " 'Mere presence at the scene of a crime is not enough' " to bring one within this category (United States v Garguilo, 310 F2d 249 (CA 2d Cir) (1962); United States v Johnson, 6 USCMA 20, 19 CMR 146; United States v Lyons, 11 USCMA 68, 28 CMR 292), yet, the court members requested that they be further enlightened on this issue.

The law officer in his attempt to respond to their inquiry, repeated his previous instruction on aiders and abettors and then supplemented it with an instruction on the liability of one whose duty it is to interfere and whose noninterference is designed by him to operate as an encouragement to or protection of the perpetrator. This ignited the above-quoted colloquy between the law officer and trial and defense counsel, with defense counsel requesting and receiving an instruction that this accused was under no duty to interfere and trial counsel asserting to the contrary.

The giving of the supplemental in-

struction as to the liability of one who is duty-bound to prevent the commission of a felony, injected into this trial an issue not litigated before the court. It placed upon the accused the burden of refuting an issue concerning which the Government had presented no evidence. If Sanders had such a duty, and this record is devoid of any evidence thereon, it was the Government's burden, if it desired to proceed on this basis, to offer proof of dereliction (State v Flynn, 119 Mo App 712, 94 SW 543; People v Diamond, 72 App Div 281, 76 NYS 57; Powell v United States, 2 F2d 47 (CA 4th Cir) (1924); cf. United States v Ford, 12 USCMA 31, 30 CMR 31; United States v Lyons, supra) and not the accused's role to show either that he had no obligation or that he performed in accordance with his responsibility. In addition to shifting the burden of proof, the instruction on the duty to interfere was inconsistent with the instruction that Sanders had no such duty. As such it was erroneous. United States v Skonberg, 10 USCMA 57, 27 CMR 131, and cases cited therein. See also Drossos v United States, 2 F2d 538 (CA 8th Cir) (1924); De Groot v United States, 78 F2d 244 (CA 9th Cir) (1935); Reid's Branson, The Law of Instructions to Juries, Military Edition, 3d ed § 120, Pertinency to evidence adduced in criminal prosecutions, page 340.

It might be argued that the law officer cured the error by his instruction that Sanders had no duty to interfere, since "He is not a law enforcement officer." However, as noted in 53 Am Jur, Trial, § 557:

"Instructions as a whole must be consistent and harmonious, not conflicting and contradictory [citing Deserant v Cerillos Coal R. Co., 178 US 409, 44 L ed 1127, 20 S Ct 967, and numerous State cases]. Where instructions give to the jury for their guidance contradictory and conflicting rules which are unexplained, and where following one would or might lead to a different result than would obtain by following the other, the instructions are inherently defective [citing Drossos v United States, 2 F2d 538 (CA 8th Cir) (1924), and numerous State cases]."

See also Perez v United States, 297 F2d 12 (CA 5th Cir) (1961); Smith v United States, 230 F2d 935 (CA 6th Cir) (1956); Williams v United States, 131 F2d 21 (CA DC Cir) (1942).

The significance put on this instruction by members of the court is apparent from Major Dougherty's efforts to make an accurate note of this wording as quoted above. Obviously aware that the court was becoming overly concerned with this principle, the law officer attempted to counteract their interest by a further exposition on the necessity of the court to weigh the credibility of the evidence. He pointed out that the accused said he did not know what was going to happen and that his testimony was corroborated by the testimony of Private T.

". . . He said that he didn't know what was going to happen, therefor [sic] he had no duty to interfere. In other words the testimony as I see it was, it was a spur of the moment act as testified by T. . . . , *if you believe that, if you believe that the accused didn't know what was going to happen at the time,* under the specific instruction that I am talking about he did not have a duty to interfere, and, of course, his testimony was . . . , his testimony is not controverted, according to his testimony, whether you believe it or not, *if you seek to believe his testimony, his testimony is that he did attempt to interfere* . . . .

". . . and his testimony is that he did attempt to interfere, that he confided [sic] in everything he was *required* to do. . . ." [Emphasis supplied.]

Rather than clarifying the matter we think this additional guidance only served to further emphasize an issue not reasonably raised by the evidence and to confuse the finders of fact. It was the Government's own witness, Private T., who substantiated

530

the accused's claim that he was neither consulted nor advised of T.'s intention to assault the victim. If the court was to disbelieve the accused it must disbelieve the Government's witness also, at least insofar as the initial assault was concerned. And just what is "everything he was *required* to do"? This certainly implies an obligation to do something and in the context in which given could only refer to the duty to interfere. Here, again, the issue was further confused.

We are well aware of the difficulty facing the law officer in attempting to answer the inquiry of the court. As he told the members, when defining aiding and abetting, "Some of the words may be confusing. . . . abets is a very broad term. . . . 'The proof must show that the aider or abettor did in some way' in a broad term 'associate himself with the venture.' " Judge Learned Hand, in United States v Peoni, 100 F2d 401 (CA2d Cir) (1938), recognized this same problem when he denominated the term "abet" as colorless.

When a definition of terms is required for a proper understanding of the issues involved, it is the responsibility of the presiding officer to instruct the court members with extreme precision. Cf. United States v Garguilo, 310 F2d (CA 2d Cir) (1962). This is especially so, where, as here, the explanation is specifically requested by the triers of fact. Absent a clear and unconfusing explanation, "of what value is an open mind, if . . . [the jury] does not know, with clear delineation, the issues upon which it is to pass judgment?" Williams v United States, 131 F2d 21, 23 (CA DC Cir) (1942).

Taken as a whole, we believe the above instructions to be sufficiently confusing to at least raise a doubt as to whether the court properly understood and utilized the correct standard on this issue. And where there is room for reasonable doubt, such doubt must be resolved in favor of the accused. United States v McIntosh, 12 USCMA 474, 31 CMR 60; United States v Lombardi, 14 USCMA 466, 34 CMR 246.

We hold, therefore, that the law officer's instructions, given in response to the inquiry of the court, were erroneous and prejudicial to the substantial rights of the accused. We find no error in the instructions given prior thereto.

The second granted issue related to the action by Major Dougherty, quoted above, in reading back to the law officer a quote of an instruction. This, allegedly, indicated possession, by at least one court member, of an unofficial and unrecorded copy of the instruction. We have carefully examined this issue in light of all the circumstances and the affidavits submitted in connection therewith and find no error therein. Cf. United States v Caldwell, 11 USCMA 257, 29 CMR 73.

The decision of the board of review is reversed. The record of trial is returned to The Judge Advocate General of the Army. A rehearing may be ordered.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

In my opinion, the instructions present no fair risk that the court members were confused or uncertain as to the issue they had to decide. The issue was simply whether the accused shared the intent of his companion in the attack on the girl. The discussion on the duty to interfere was unnecessary under the evidence because, as the law officer pointed out, the accused's own testimony was to the effect "that he did attempt to interfere" and dissuade his companion from completing his apparent purpose. The law officer also advised the court members that under his instructions the accused "did not have a duty to interfere." I would affirm the decision of the board of review.