**UNITED STATES, Appellee,**

v.

**James E. PRITCHETT, Technical Sergeant, U.S. Air Force, Appellant.**

No. 63,368.
ACM 27520.

U.S. Court of Military Appeals.

Argued June 12, 1990.

Decided Sept. 26, 1990.

For Appellant: *Captain Paul M. Danko-vich* (argued); *Colonel Richard F. O'Hair* (on brief); *Glenn G. Cortello, Esq.*

For Appellee: *Major Paul H. Blackwell, Jr.* (argued); *Colonel Robert E. Giovagno-ni,* and *Captain David G. Nix* (on brief); *Colonel Joe R. Lamport* and *Major Terry M. Petrie.*

*Opinion of the Court*

SULLIVAN, Judge:

On October 17, 1988, appellant was tried by a military judge sitting alone as a general-court martial at Ramstein Air Base, Federal Republic of Germany. Contrary to his pleas, he was convicted of three specifications of distributing marijuana and one specification of possessing marijuana with intent to distribute, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. He was sentenced to a bad-conduct discharge, confinement and forfeiture of $400.00 pay per month for 6 months, and reduction to pay grade E–1. The convening authority approved the sentence. On June 14, 1989, the Court of Military Review affirmed the findings of guilty and the sentence in an unpublished opinion.

This Court granted review on the following issue of law:

WHETHER ANY RATIONAL TRIER OF FACT VIEWING THE EVIDENCE IN A LIGHT MOST FAVORABLE TO THE PROSECUTION, COULD FIND PROOF OF EACH AND EVERY ELEMENT NECESSARY TO CONSTITUTE THE OFFENSE(S) BEYOND A REASONABLE DOUBT? *JACKSON v. VIRGINIA*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979).

We hold, as did the Court of Military Review, that there was sufficient evidence to support the findings of guilty made by the military judge in the present case. *See generally United States v. Hart*, 25 MJ 143 (CMA 1987), *cert. denied*, 488 U.S. 830, 109 S.Ct. 85, 102 L.Ed.2d 61 (1988).

A stipulation of fact was agreed to by the parties in this case. It established that on several occasions appellant's wife distributed marijuana in hashish form to Specialist Clyde Gardener, and she also possessed additional marijuana in hashish form on the last occasion. These distributions for money occurred on May 6, 11, and 13, 1988, in appellant's apartment when he was present. This stipulation is attached as an appendix to this opinion.

In addition, Specialist Gardener testified that he knew appellant and his wife but maintained a business, rather than a social, relationship with them. His business was to purchase hashish from Mrs. Pritchett, which he had done a number of times prior to October 1987. He further stated that, on one occasion during the last two weeks of October 1987, he purchased hashish directly from appellant because the latter's wife was not at home.[1]

Specialist Gardener also testified that on May 6th, he called the Pritchett household to arrange a drug deal with Mrs. Pritchett. This conversation was monitored by Agent Bissel of the Air Force Office of Special Investigations (OSI). When he arrived at the house, appellant answered the door, and they both said, "What's up."[2] Special-

---

**1.** Appellant was found not guilty of this offense by the military judge.

**2.** Q. Okay. Directing your attention again to 6 May 1988, did you make a purchase of hashish from Kaye [Pritchett] that day?

A. Yes, I did.

Q. Okay. If you will, for the judge, if you'll describe how that deal was arranged.

A. I called her on the phone; and she told me, "Sure. Come on over."

ist Gardener then testified that appellant "went to call for his wife, but she was already coming towards me; and he closed the door and went and sat back down on the couch." The couch was "a couple of feet" away from the doorway where Mrs. Pritchett and Specialist Gardener· exchanged drugs for money. Mrs. Pritchett retrieved the hash from her pocket; but it did not appear to be enough, so "she got some more" from the schrank (similar to a wardrobe or cabinet), which was in the living room. Appellant was only a few feet from Specialist Gardener during this transaction.

On May 11, 1988, a second controlled buy occurred. Specialist Gardener testified that he was wired with a CID (Criminal Investigation Command) "listening device." He testified that he again called appellant's wife on the phone and arranged the deal. When he arrived at the Pritchett residence, appellant answered the door. In the conversation prior to the sale, Specialist Gardener asked Mrs. Pritchett, "Can you hook me up with somebody after you PCS?" Appellant responded, "Well, somebody does it, but not that often." Specialist Gardener stated that he believed there was no confusion that they were talking about a new drug supplier. Appellant was seated in their living room approximately one foot from his wife and Specialist Gardener during this conversation and sale.

During the final controlled buy on May 13, 1988, Specialist Gardener stated that he

> Q. Okay. And what number did you call? (After a brief pause) Well, I'm not asking for the—Was it the same number that you called previously?
> A. Yes.
> Q. And when you called, how did you know it was Kaye?
> A. Because I asked for her; and she said, "This is her." And I said, "This is 'G.' What's up?"
> Q. And what did she say?
> A. She said like, "Well, it's cool." And I said, "Okay." And I told her how much I was going to buy. And she said, "Okay."
>  \*    \*    \*    \*    \*    \*
> Q. When you got there, who answered the door?

and Mrs. Pritchett retrieved the hash from the kitchen. He said appellant was asleep in a chair near the door of the apartment. Within one minute after leaving, Gardener testified that he saw the German police and CID agents enter the Pritchetts' apartment building.

Special Agent Bone, OSI, also was called as a witness by the prosecution and testified to the events of May 13 as follows:

> As the German police entered the quarters we followed directly after them inside....[T]here was a black, men's ... clutch bag in ... [appellant's] right hand, which was seized by the German police. At that point, ... [appellant produced money]. [W]e later went through the money and compared the serial numbers ... These numbers are the numbers from the bills that were in the [bag] ... that also matched the previous receipts, the money that was issued to the informant.

Two hundred and forty dollars out of the $300.00 that had been issued to Gardener on May 6 was recovered. Special Agent Laude, another government witness, also testified that an additional amount of hashish was found in the apartment (166 grams) and that this amount was inconsistent "with what the average smoker keeps on hand for smoking and personal use." Special Agent Laude also verified that the receipts for the money issued to Specialist Gardener on May 13, 1988, contained the same serial numbers as other money found in appellant's purse. Finally, Chief War-

> A. Mr. Pritchett.
> Q. And what did you say to him?
> A. "What's up?"
> Q. And what was said in return?
> A. "What's up?"
> Q. Okay. And what else happened after that?
> A. He went to call for his wife, but she was already coming towards me; and he closed the door and went and sat back down on the couch.
> Q. Now, when you say "she was already coming," what do you mean by that?
> A. She was already, you know, headed in my direction.
> Q. And you were standing where-in the doorway?
> A. Yes.

rant Officer Llewellyn, a Latent Print Examiner, testified that appellant's fingerprints were found on two foil wrappings which contained some hashish in stick form, but not on the coffee can. It was previously established that Mrs. Pritchett produced these foil hashish sticks from a coffee can located in a shrank in the bathroom of the apartment.

I

The standard for determining the legal sufficiency of evidence supporting findings of guilty at courts-martial is well established.[3] Judge Cox, writing in *United States v. Harper*, 22 MJ 157, 161 (CMA 1986), stated, "[I]n this context, sufficient evidence generally means some legal and competent evidence from which a court-martial may find or infer beyond a reasonable doubt those facts required by law for conviction." This standard for appellate review mirrors that articulated by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979), and has been repeatedly employed in our decisions. *See United States v. Gordon*, 31 MJ 30, 34 (1990); *United States v. Hart, supra* at 146. Moreover, it is well established that, in applying this test, all inferences and credibility determinations must be drawn in favor of the prosecution. *See Jackson v. Virginia, supra.*

In light of this standard we must turn to the record before us and appellant's convictions under Article 112a. There is no dispute in this case that sufficient evidence was introduced to show appellant's wife distributed marijuana to Specialist Gardener on May 6, 11, and 13, 1988. Moreover, there is no dispute that sufficient evidence was introduced to show that she possessed additional marijuana with intent to distribute on May 13, 1988, as well. Our particular concern is whether sufficient evidence was admitted at this trial to show beyond a reasonable doubt that appellant aided and abetted his wife's crimes. *See United States v. Burroughs*, 12 MJ 380 (CMA 1982). *See generally* Annotation, *Offense of Aiding and Abetting Illegal Possession of Drugs or Narcotics*, 47 ALR 3d 1239 (1973), and 12 MJ at 382 n.3.

Article 77, UCMJ, 10 USC § 877, defines principals as follows:

> Any person punishable under this chapter who-
>
> > (1) commits an offense punishable by this chapter, *or aids, abets,* counsels, commands, or procures *its commission;* or
> >
> > (2) causes an act to be done which if directly performed by him would be punishable by this chapter; *is a principal.*

(Emphasis added.)

In *United States v. Knudson*, 14 MJ 13, 15 (CMA 1982), Judge Cook commented on the legal requirements for aiding and abetting under this statute. He said:

> The law requires that it be established that there is a concert of purpose or the aiding or encouraging of the commission of the criminal act and a conscious sharing of the criminal intent. *United States v. Burroughs*, 12 MJ 380 (CMA 1982), citing *United States v. Jackson*, 6 USCMA 193, 19 CMR 319 (1955). The fact that the accused did not know in advance of the particular transfers or the parties to whom the transfers would be made does not relieve him of criminal responsibility. *United States v. Dunbar*, 12 MJ 218 (CMA 1982). *All that is necessary is to show some affirmative participation which at least encourages the principal to commit the offense in all its elements as defined by the statute.* Actual participation in the substantive crime is not required so long as the elements of aiding and abetting are estab-

---

**3.** There was no motion for findings of not guilty by defense at the close of the prosecution's case with respect to the findings at issue on this appeal. A successful motion for such a finding was made by defense with respect to an alleged distribution on May 10, 1988, when appellant was not in the house at the time of that alleged offense.

lished. *United States v. Raper*, 676 F.2d 841 (D.C. Cir.1982).

(Emphasis added.)

In *United States v. Raper, supra*, the Court of Appeals for the District of Columbia said the same about the similarly worded 18 USC § 2:

> Under this statute, there must be a guilty principal before a second party can be found to be an aider or abettor. *United States v. Staten, supra* 581 [F.2d 878] at 887; [ (D.C.Cir.1978) ] *United States v. Cades*, 495 F.2d 1166, 1167 (3d Cir.1974); *United States v. Barfield*, 447 F.2d 85, 89 (5th Cir.1971); *United States v. Rodgers*, 419 F.2d 1315, 1317 (10th Cir.1969). That second party, however, upon a finding that he aided or abetted the offense, is guilty under the statute as a principal. *United States v. Fultz*, 602 F.2d 830, 833 (8th Cir.1979); *United States v. Harris*, 523 F.2d 172 (6th Cir. 1975).

The elements of aiding or abetting an offense are (1) the specific intent to facilitate the commission of a crime by another, *United States v. Prince*, 529 F.2d 1108 (6th Cir.), *cert. denied*, 429 U.S. 838, 97 S.Ct. 108, 50 L.Ed.2d 105 (1976); (2) guilty knowledge on the part of the accused; (3) that an offense was being committed by someone; and (4) that the accused assisted or participated in the commission of the offense. *United States v. Staten, supra*, 581 F.2d at 886–887; *United States v. Wiley*, 492 F.2d 547, 551 (D.C. Cir.1973).

The classic interpretation of the aiding and abetting rule of law is that by Judge Learned Hand in *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938), which was quoted by Justice Douglas in *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949):

> In order to aid and abet another to commit a crime it is necessary that a defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by

his action to make it succeed." L. Hand, J., in *United States v. Peoni*, 100 F.2d 401, 402.

> *See also United States v. Staten, supra*, 581 F.2d at 887; *United States v. Holder*, 566 F.2d 617, 619 (8th Cir.1977); *United States v. Kelton*, 446 F.2d 669, 671 (8th Cir.1971).

> *What is required on the part of the aider is sufficient knowledge and participation to indicate that he knowingly and willfully participated in the offense in a manner that indicated he intended to make it succeed ....*

.676 F.2d at 849 (emphasis added).

▬ In addition, it is clear that mere presence at the scene of a crime committed by another is not sufficient evidence to establish that the person present is an aider and abettor to another's crime. *United States v. Johnson*, 6 USCMA 20, 23–24, 19 CMR 146, 149–50 (1955); *United States v. Guest*, 3 USCMA 147, 151–52, 11 CMR 147, 151–52 (1953); *see* para. 1b(3), Part IV, Manual for Courts–Martial, United States, 1984; *see generally United States v. Kelly*, 888 F.2d 732, 742 (11th Cir.1989); *United States v. Pantoja–Soto*, 739 F.2d 1520, 1525–27 (11th Cir.1984), *cert. denied*, 470 U.S. 1008, 105 S.Ct. 1369, 84 L.Ed.2d 389 (1985). On the other hand, presence at the scene is a circumstance which may be considered by the factfinder in determining whether a person aided and abetted another in the commission of a crime. *See United States v. Lechuga*, 888 F.2d 1472, 1477 (5th Cir.1989). Accordingly, we still must examine the record for other evidence of appellant's purposeful association with these crimes and some act of participation, assistance, or encouragement of each crime by him. *United States v. Burroughs*, 12 MJ at 382–86.

▬ Preliminarily, we note that these incidents need not be viewed in isolation. Each alleged distribution by appellant's wife occurred at appellant's home, with the same drug purchaser, Specialist Gardener, and in the presence of appellant. *See generally* Annotation, *Conviction of Possession of Illicit Drugs Found in Premises of*

*Which Defendant Was In Nonexclusive Possession*, 56 ALR 3d 948 (1974). Moreover, evidence was admitted that Sergeant Gardener visited with appellant and his wife on prior occasions but only for the purpose of acquiring drugs. Finally, it was shown that on one occasion in October he purchased drugs directly from appellant when the latter's wife was not there.[4] Evidence of such a course of conduct reflects appellant's complete understanding and awareness of the status of his wife's criminal venture of distributing drugs. *See United States v. Collins*, 779 F.2d 1520, 1528–31 (11th Cir.1986). Moreover, this was evidence from which a rational factfinder could conclude beyond a reasonable doubt that appellant willfully associated himself with and knowingly shared the criminal intent of his wife on the charged occasions. *United States v. Leavitt*, 878 F.2d 1329, 1338 (11th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989); *United States v. Cooper*, 873 F.2d 269, 274 (11th Cir.), *cert. denied,* — U.S ——, 110 S.Ct. 118, 107 L.Ed.2d 79 (1989); *United States v. Savinovich*, 845 F.2d 834, 838 (9th Cir.), *cert. denied,* 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988); *cf. United States v. Pantoja–Soto*, 739 F.2d at 1525–27.

## II

Our remaining inquiry is whether evidence was admitted showing appellant participated in, assisted, or encouraged his wife in these crimes. Each crime must be considered separately.

## A

■ First, on the possession-of-marijuana-with-intent-to-distribute charge, there was sufficient evidence to show appellant aided and abetted his wife's commission of this crime. Admittedly, his wife produced the coffee can of drugs from a dresser in their bathroom, and appellant denied know-

ing of its presence. However, it was unrebutted that this was appellant's apartment as well as his wife's. Moreover, the 166 grams of hashish were located in a coffee can in a common area, namely-the only bathroom in the apartment. Finally, appellant's fingerprints were found on several individual foil wrapped pieces located in the can.

Federal civilian case law would clearly permit appellant's conviction for actual possession, constructive possession, or conspiracy to possess marijuana in these circumstances. *See United States v. Noibi*, 780 F.2d 1419, 1421 (8th Cir.1986); *United States v. Cravero*, 545 F.2d 406, 411 (5th Cir.1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977); *see generally United States v. Pantoja–Soto, supra* at 1526; *cf. United States v. Ward*, 703 F.2d 1058, 1060 n.4 (8th Cir.1983). *See also Commonwealth v. Harris*, 397 A.2d 424, 429–30 (Pa.Super.1979). So, in a very real sense, it can be said that he participated in his wife's criminal venture by sharing her possession of the drugs held for distribution. *United States v. Fischel*, 686 F.2d 1082, 1089 (5th Cir.1982); *cf. United States v. Jackson*, 526 F.2d 1236, 1238 (5th Cir.1976). Moreover, case law would also permit his conviction for aiding and abetting because he knowingly permitted his residence to be used as a repository for the illegal drugs possessed by another. *See United States v. Keck*, 773 F.2d 759, 769 (7th Cir.1985).

■ We also note that, on this same date (May 13, 1988), appellant was caught immediately after the sale of drugs with a black purse in his hand. It contained the recorded bills used by the police in the previous drug buy. This evidence suggests that he was involved in the care and custody of the funds produced by the drug sale. *See United States v. Wesson*, 889 F.2d 134 (7th Cir.1989); *United States v. Natel*, 812 F.2d 937, 941–42 (5th Cir.1987); *United States*

---

4. Appellant was found not guilty of this offense. However, we need not speculate as to the reasons why the judge reached such a conclusion. It suffices to say that evidence of this offense is

in this record of trial and can be considered on this appeal. *See United States v. LaGuardia*, 774 F.2d 317, 320 n. 1 (8th Cir.1985).

*v. Raper, supra* at 849. In addition, evidence was admitted that appellant's fingerprints were found on tin-foil-wrapped pieces of hash that Mrs. Pritchett turned over to police shortly after the sale. This evidence suggests he was involved with the drug venture in a preparation and packaging capacity. *See United States v. Noibi; United States v. Pantoja–Soto; United States v. Cravero,* all *supra.* Such conduct clearly constitutes meaningful assistance in the distribution on that date, even though appellant was purportedly asleep during the actual transaction. *See United States v. Broadwell,* 870 F.2d 594, 608 (11th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 125, 107 L.Ed.2d 85 (1989).

B

■ Evidence of appellant's participation in the May 11, 1988, distribution of drugs is somewhat more subtle but equally sufficient. On that occasion it was shown that Specialist Gardener telephoned the accused's wife at their home and arranged to purchase drugs. *See United States v. Savinovich, supra* at 838. It was then shown that Specialist Gardener was let into appellant's house by appellant, discussed future drug sales with him and his wife, and purchased some drugs in his immediate presence. The immediacy of appellant's presence, his preliminary drug talk, and his maintenance of a drug-sale safe house [5] constitute active encouragement and assistance in our mind. *See United States v. Keck, supra; United States v. Farid,* 733 F.2d 1318, 1319 (8th Cir.1984).

C

■ Turning to the distribution by appellant's wife to Specialist Gardener on May 6, 1988, additional evidence other than a showing of his mere presence at the scene of the crime also existed on this charge. Sergeant Gardener testified that, when appellant answered the door, they both only said, "What's up?" and then appellant immediately went to get his wife. In light of evidence of appellant's prior knowledge of and participation in drug distribution between his wife and Specialist Gardener,

this conduct could be viewed as acts facilitating the May 6th distribution. *See United States v. Medina,* 887 F.2d 528, 532 (5th Cir.1989); *United States v. Juarez,* 566 F.2d 511, 516 (5th Cir.1978); *cf. United States v. Batimana,* 623 F.2d 1366, 1370 (9th Cir.), *cert. denied,* 449 U.S. 1038, 101 S.Ct. 617, 66 L.Ed.2d 500 (1980). Moreover, such a conclusion seems especially justified since he then permitted the sale of drugs to occur in a common area of his own home. *See United States v. Richardson,* 764 F.2d 1514, 1525 (11th Cir.1985); *United States v. Harris,* 713 F.2d 623, 626 (11th Cir.1983); *see also United States v. La-Guardia,* 774 F.2d 317, 319 (8th Cir.1985); *United States v. Lawson,* 682 F.2d 1012, 1017–18 (D.C.Cir.1982) (and cases cited therein). Finally, money from the controlled buy on this date was found on May 13, 1988, in appellant's possession along with proceeds from the later controlled drug transactions. This is ample evidence of guilt. *Cf. United States v. Kelly,* 888 F.2d at 742–43; *United States v. Weaver,* 594 F.2d 1272 (9th Cir.1979).

III

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge EVERETT and Judge COX concur.

APPENDIX

The Stipulation of Fact states:

On 6 May 1988, Specialist (E–4) Clyde L. Gardener, a CID informant, met with agents from the AFOSI/CID. Specialist Gardener was strip-searched as part of a controlled narcotics buy that was to take place that day. The strip-search was conducted to ensure Specialist Gardener did not have any contraband or other prohibited items in his possession during the course of the controlled narcotics buy. The strip-search produced negative

---

**5.** See Annotation, Permitting Unlawful Use of Narcotics in Private Home As Criminal Offense, 54 ALR 3d 1297 (1973).

results. Specialist Gardener was thereafter supplied with $300.00 of AFOSI funds with which to purchase hashish. The $300.00 was in U.S. currency in the following denominations, to wit: two fifty dollar bills (Nos. G24226540A and I01830910A); nine twenty dollar bills (Nos. G46593928C, D35230013A, D19293177A, G97295509B, L08204822D, D85617848B, B56151245H, B56963740C, and F3888629B); and two ten dollar bills (Nos. F80622823B and H00628479*). Thereafter, Specialist Gardener was transported to the Vogelweh Military Family Housing area where he proceeded on foot to Building 2721, Apartment G, the residence occupied by the accused and his wife, Rosalyn K. Pritchett. Inside the residence, Specialist Gardener purchased ten pieces of hashish for $300.00. The accused's wife delivered the hashish to Specialist Gardener, who gave her the $300.00. Specialist Gardener then departed the residence. After proceeding to a prearranged area, Specialist Gardener was picked up by Karl J. Kelz, CID Investigator. Specialist Gardener was once again strip-searched with negative results, and released the hashish he had purchased to Mr. Kelz, who turned it over to Special Agent David E. Bone, AFOSI. The hashish has been in the custody of the AFOSI since that date. On 15 June 1988, the hashish was forwarded by registered mail to the U.S. Army Criminal Investigation Laboratory (USACIL) in Frankfurt, Federal Republic of Germany, for chemical analysis. The hashish was analyzed by Nikola Angelov, Forensic Chemist, who determined the hashish weighed 16.27 grams and was indeed marijuana in the hashish form, a Schedule I controlled substance.

On 10 May 1988, Specialist Gardener met once again with agents from AFOSI/CID. Specialist Gardener was strip-searched as part of a second controlled narcotics buy in this case. The strip-search produced negative results. Specialist Gardener was thereafter supplied with $90.00 in CID fund with which to purchase hashish. The $90.00 was in U.S. currency in the following denominations, to wit: three twenty dollar bills (Nos. L04002254C, E47526391C, and H43852610A); one ten dollar bill (No. L50305209B); and four five dollar bills (Nos. B22422933C, B57057837D, J65903907A, and B57057589D). Thereafter, Specialist Gardener was transported to the Vogelweh Military Family Housing area where he proceeded on foot to the accused's residence. Inside the residence, Specialist Gardener purchased three pieces of hashish for $90.00 The accused's wife delivered the hashish to Specialist Gardener, who gave her the $90.00. During this transaction, the accused was outside the residence. Specialist Gardener then departed the residence. After proceeding to a prearranged area, Specialist Gardener was picked up by two special agents. Specialist Gardener was once again strip-searched with negative results, and released the hashish he had purchased to Special Agent David K. Wickey of the CID. Thereafter, the hashish was transferred to Special Agent Bone of the AFOSI. The hashish has been in the custody of the AFOSI since then. On 15 June 1988, the hashish was forwarded by registered mail to USACIL for chemical analysis. The hashish was analyzed by Nikola Angelov, who determined the hashish weighed 6.73 grams and was indeed marijuana in the hashish form, a Schedule I controlled substance.

On 11 May 1988, Specialist Gardener met once again with agents from the AFOSI/CID. Specialist Gardener was strip-searched as part of a third controlled narcotics buy in this case. The strip-search produced negative results. Specialist Gardener was thereafter supplied with $60.00 in AFOSI funds with which to purchase hashish. The $60.00 was in U.S. currency in the following denominations, to wit: two twenty dollar bills (Nos. K98140865A and G47969160D); and two ten dollar bills (Nos. E11459369A and B94184990D). Thereafter, Specialist Gardener was

transported to the Vogelweh Military Family Housing area where he proceeded on foot to the accused's residence. Inside the residence, Specialist Gardener purchased two pieces of hashish for $60.00. The accused's wife delivered the hashish to Specialist Gardener, who gave her the $60.00. Specialist Gardener then departed the residence. After proceeding to a prearranged area, Specialist Gardener was once again strip-searched with negative results, and released the hashish he had purchased to Special Agent Bone of the AFOSI. The hashish has been in the custody of the AFOSI since that date. On 15 June 1988, the hashish was forwarded by registered mail to USACIL for chemical analysis. The hashish was analyzed by Nikola Angelov, who determined the hashish weighed 4.43 grams and was indeed marijuana in the hashish form, a Schedule I controlled substance.

On 13 May 1988, Specialist Gardener met once again with agents from the AFOSI/CID. Specialist Gardener was strip-searched as a part of the final controlled narcotics buy in this case. The strip-search produced negative results. Specialist Gardener was thereafter supplied with $180.00 in CID funds with which to purchase hashish. The $180.00 was in U.S. currency in the following denominations, to wit: nine twenty dollar bills (Nos. G42747039B, B08685911C, B27219787G, D92372500A, L72914371A, D89649588A, A30038567B, G70239350B, and A94985454A). Thereafter, Specialist Gardener was transported to the Vogelweh Military Family Housing area where he proceeded on foot to the accused's residence. Inside the residence, Specialist Gardener purchased six pieces of hashish for $180.00. The accused's wife delivered the hashish to Specialist Gardener, who gave her the $180.00. Specialist Gardener then departed the residence. After proceeding to a prearranged area, Specialist Gardener was once again strip-searched with negative results. Specialist Gardener subsequently released the hashish he had purchased to Special Agent Smith of the AFOSI. The hashish has been in the custody of the AFOSI since that date. On 15 June 1988, the hashish was forwarded by registered mail to USACIL for chemical analysis. The hashish was analyzed by Nikola Angelov, who determined the hashish weighed 13.17 grams and was indeed marijuana in the hashish form, a Schedule I controlled substance.

On 13 May 1988, the accused signed an AF Form 1364, Consent for Search and Seizure, after being advised of his rights by Special Agent Bone of the AFOSI. The accused consented to a search of his residence, storage room, and vehicle. During the course of the search, the accused's wife went into the bathroom of their residence and retrieved a coffee can containing three plastic ziplock bags of hashish. Mrs. Pritchett gave the evidence (Prosecution Exhibit 2) to Special Agent Mark Laude, U.S. Army Criminal Investigator. The three bags contained the following items, to wit: approximately 100 grams of hashish; approximately 55 grams of hashish of which strips had been cut and wrapped in foil; and approximately 45 grams of foil wrapped hashish. Additionally, a small quantity of marijuana in the leafy form was contained in a small ziplocked bag inside the coffee can. This evidence (Prosecution Exhibit 2) was turned over to the German Police that night. The evidence (Prosecution Exhibit 2) was later analyzed by Dr. Heinrich Fock, University of Kaiserslautern, who determined it to be marijuana in the hashish and leafy forms. The evidence (Prosecution Exhibit 2) was forwarded at a later date by registered mail to USACIL for additional chemical analysis. The evidence (Prosecution Exhibit 2) was analyzed by Nikola Angelov, who determined it contained 165.60 grams of marijuana in the hashish form and 1.75 grams of marijuana in the leafy form, both of which are Schedule I controlled substances.