# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

————————————

**No. 201600139**

————————————

## UNITED STATES OF AMERICA
Appellee

v.

## BENJAMIN A. RAMIREZ
Lance Corporal (E-3), U.S. Marine Corps
Appellant

————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Lieutenant Colonel Elizabeth Harvey, USMC.
Convening Authority: Commanding General, First Marines
Logistics Group, Camp Pendleton, California.
Staff Judge Advocate's Recommendation: Lieutenant Colonel
Thomas B. Merritt, Jr., USMC.
For Appellant: Lieutenant Jacob Meusch, JAGC, USN.
For Appellee: Lieutenant Taurean K. Brown, JAGC, USN; Brian K.
Keller, Esq.

————————————

Decided 27 July 2017

————————————

Before MARKS, RUGH, and JONES, *Appellate Military Judges*

————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

————————————

RUGH, Judge**:**

A panel of members with enlisted representation sitting as a general court-martial convicted the appellant, contrary to his pleas, of two specifications of rape in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2012). The members sentenced the appellant to 10 years' confinement, reduction to pay grade E-1, forfeiture of all pay and allowances, and a dishonorable discharge. The convening

authority approved the adjudged sentence and, except for the punitive discharge, ordered the sentence executed.

The appellant now asserts seven assignments of error (AOE): (1) that the evidence of the appellant's conviction to rape by unlawful force was legally and factually insufficient; (2) that the evidence of the appellant's conviction as an aider and abettor to rape was legally and factually insufficient; (3) that the military judge's manner of instructing the members regarding principal liability was plain error; (4) that the military judge's denial of the appellant's request for the expert assistance of a forensic psychologist, a clinical psychologist, and a forensic toxicologist was an abuse of discretion; (5) that the trial counsel made improper argument to the members; (6) that the trial defense counsel was ineffective; and (7) that the appellant's sentence was inappropriately severe and highly disparate from that of his co-offender.

We agree with the appellant's second AOE, set aside the finding of guilty to Specification 3 of the Charge, and reassess the sentence below. The appellant's third AOE is rendered moot. Otherwise, we find no error materially prejudicial to the appellant's substantial rights and affirm. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

While separately visiting Los Angeles over the 2014 Valentine's Day weekend, the appellant, Lance Corporal (LCpl) Samuel Arroyo, and LCpl P met up for shopping, drinking, and dancing. Afterwards, they returned to LCpl Arroyo's family home where the trio quibbled over sleeping arrangements between two guest beds—one larger than the other—available to the three of them in the guest room. They finally settled on the appellant and LCpl P sleeping in the larger bed while LCpl Arroyo took the smaller bed.

Later that night, LCpl P woke briefly when LCpl Arroyo climbed into the larger bed next to her. She then fell back asleep and awoke a second time when LCpl Arroyo attempted to push open her legs. The appellant's arm was now across her chest holding her down.

LCpl P resisted LCpl Arroyo and called out "no." In response, LCpl Arroyo became more aggressive, removing her pants, and penetrating LCpl P with his tongue and fingers. At the same time, the appellant continued to hold LCpl P down while repeatedly saying, "calm down."[1] Shortly, LCpl Arroyo stopped, returned to his bed, and LCpl P curled up into a ball.

> **Q** [trial counsel]: Why did you do that?

---

[1] Record at 337.

A [LCpl P]: I was tired, I couldn't believe it. I mean, it just – struggling, crying, I just wanted to disappear.[2]

LCpl P then fell asleep. She awoke to the appellant on top of her penetrating her with his penis. LCpl P attempted to push him off but couldn't because of his size—the appellant was "a very large person."[3] During the assault, he moved her into several positions, including on top of him, by grabbing her and putting her "however he wanted."[4] As he continued, the appellant told LCpl P that he liked her and that he thought she was pretty. When she tried to pull away from him, he repeated "don't pull away, don't pull away."[5] After he was done, he told LCpl P he was sorry. LCpl P then cried herself to sleep. She rose early the next morning, gathered her things, and left.

After LCpl P left, LCpl Arroyo texted her and the appellant, asking "hey, are you alive?"[6] LCpl P responded, "F[***] you guys, don't ever talk to me again."[7] Later that day, the appellant responded, texting her:

Hey ..i wanted to apologize for last night, i know it probably doesn't mean much now but i am really sorry i fucked up and there's no excuse i just hope that you'll be able to forgive me.[8]

A month later LCpl P reported the assault. At the behest of Naval Criminal Investigative Service investigators, she reengaged the appellant on a pretext over text message. The appellant again apologized, texting:

Oh…i am sorry as f[***] about that i know i f[***]ed up rly bad and i don't know how to make it up…"[9]

He then professed a lack of memory about what happened that night.

Subsequently, LCpl Arroyo and the government negotiated an agreement in which LCpl Arroyo agreed to testify at the appellant's court-martial. In exchange for his cooperation, LCpl Arroyo received testimonial immunity, and charges against him alleging assaults consummated by battery were

---

[2] *Id.* at 340.

[3] *Id.* at 341.

[4] *Id.* at 342.

[5] *Id.* at 341.

[6] *Id.* at 461.

[7] Prosecution Exhibit (PE) 1 at 3.

[8] *Id.* ([sic] throughout).

[9] PE 2 at 3 ([sic] throughout).

referred to special court-martial in lieu of the sex offenses previously referred to general court-martial.

At trial, LCpl Arroyo testified that he originally climbed into bed with LCpl P as she slept so that he could kiss her. However, she was unresponsive until he placed his hand on her crotch; at which point, she awoke and began resisting him.

> Q: Did you pull her pants off?
>
> A [LCpl Arroyo]: Yes. She was fighting me. She was resisting. I had to use a little bit of strength to actually do what I was trying to do.[10]

As LCpl Arroyo attempted to remove LCpl P's pants so that he could perform oral sex on her, he noticed the appellant was now awake. The appellant's body was over LCpl P, his hand was on her shoulder holding her down, and he appeared to be kissing her.

> Q: And what was [the appellant] doing at this time?
>
> A: At this point, I mean, I believe he was still kissing her. Basically, in the same position that he was when I started trying – I started – I attempted – I first attempted to perform oral sex on her. From what I remember, she now was up.
>
> Q: What did you do then?
>
> A: Well, as I was trying to perform oral sex, [the appellant] was slowly pushing me. Pushing me down off the bed. It wasn't necessarily like a shove or a kick or something but he was giving me nudges to where, basically, what I perceived it as, hinting me to just back off. So when I finally got the hint, I jumped off the bed down towards the foot of the bed, I laid down and fell asleep.[11]

That next day, the appellant drove LCpl Arroyo from the Los Angeles, California, area back to Twentynine Palms, California, where they were stationed together. A few minutes into the drive the appellant asked, "How f[***]ed are we?"[12] LCpl Arroyo responded, "I don't know."[13] They made the rest of the trip in silence.

---

[10] Record at 458.

[11] *Id.* at 459.

[12] *Id.* at 461.

[13] *Id.*

## II. DISCUSSION

### A. Legal and factual sufficiency – rape by unlawful force

The appellant first asserts that his conviction to rape by unlawful force—involving the vaginal/penile penetration of LCpl P by him after LCpl Arroyo returned to the smaller bed—was legally and factually insufficient because he only used such force as was "sufficient to position" LCpl P[14] and because LCpl P's memory and her ability to observe were unreliable.

We review questions of legal and factual sufficiency *de novo*. Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citing *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)). In applying this test, "we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is whether "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citing *Turner*, 25 M.J. at 325 and Art. 66(c), UCMJ), *aff'd on other grounds*, 64 M.J. 348 (C.A.A.F. 2007). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

Article 120**,** UCMJ, provides, "(a) *Rape*. Any person subject to this chapter who commits a sexual act upon another person by—(1) using unlawful force against that other person. . . . is guilty of rape and shall be punished as a court-martial may direct." 10 U.S.C. § 920(a). "Force" is: "(A) the use of a weapon; (B) the use of such physical strength or violence as is sufficient to overcome, restrain, or injure a person; or (C) inflicting physical harm sufficient to coerce or compel submission by the victim." 10 U.S.C. § 920(g)(5). "Unlawful force" is defined as "an act of force done without legal justification or excuse." 10 U.S.C. § 920(g)(6).

---

[14] Appellant's Brief of 17 Aug 2016 at 30.

For a charge of rape by unlawful force, the government must prove beyond reasonable doubt that the accused used a weapon; used such physical strength or violence as is sufficient to overcome, restrain, or injure a person; or inflicted physical harm sufficient to coerce or compel submission by the victim, and that those acts were "done without legal justification or excuse." 10 U.S.C. § 920(g)(5)–(6).

Here, the evidence establishes the required degree of force by the appellant to overcome and restrain LCpl P. LCpl P testified that she attempted to push the appellant off of her but was unable to because of his size. Likewise, he grabbed and moved LCpl P into several sexual positions despite her actively struggling. When she did escape him and attempted to turn away from him, he held her, re-penetrated her, and stated, "I told you not to pull away."[15] We agree with the appellant that he did not "punch[] her, slap[] her, chok[e] her, or apply[] pressure to the point that caused her physical pain or bruising."[16] But those acts are not the universe of behaviors that may meet the requirements of the statute. Other acts of force, as long as they are "sufficient to overcome, restrain, or injure," can suffice.

In that regard, this case is distinguishable from *United States v. Thomas*, 74 M.J. 563, 567 (N-M. Ct. Crim. App. 2014), in which we held that, "simply being on top of the other person during a sexual act, without anything more, is not enough" to prove the use of such physical strength or violence as was sufficient to overcome, restrain, or injure. Here, LCpl P's reliable testimony and LCpl Arroyo's corroborating account demonstrate that the appellant did more than simply "be" on top. Likewise, the appellant's highly incriminating text messages and statements after the fact strongly cut against any assertion that LCpl P consented to the acts alleged.[17] As a result, there is

---

[15] Record at 341.

[16] Appellant's Brief at 30-31.

[17] This is also consistent with this and other military courts' prior analysis. *See United States v. Parker*, 75 M.J. 603, 610 (N-M. Ct. Crim. App. 2016) (holding that, where the force used to commit the sexual act was limited to rolling the victim over onto his back and exposing his penis, evidence of force sufficient to overcome the person was absent); *United States v. Hutchinson*, No. 201400022, 2015 CCA LEXIS 71 at *12, unpublished op. (N-M. Ct. Crim. App. 4 Mar 2015) (affirming a conviction for rape using unlawful force under circumstances in which the appellant forcibly flipped the victim over, put his hand on her neck so that she could not breathe, removed her pants while the victim protested, and then penetrated her vagina with his penis while choking her as she told him "no"), *rev. denied*, 75 M.J. 42 (C.A.A.F. 2015); and *United States v. Evans*, No. 38651, 2015 CCA LEXIS 445 at *6, unpublished op. (A. F. Ct. Crim. App. 22 Oct 2015) (affirming a conviction for rape using unlawful force under circumstances in which the appellant grabbed the victim

sufficient evidence for the trier of fact and for us to conclude beyond reasonable doubt that the appellant raped LCpl P using unlawful force.

## B. Legal and factual sufficiency – liability as aider and abettor

Next, the appellant asserts that his second conviction for rape by unlawful force—as an accomplice when LCpl Arroyo orally and digitally penetrated LCpl P—was legally and factually insufficient because the appellant did not share in LCpl Arroyo's criminal purpose or design.

Article 77(1), UCMJ, provides that a person is liable as a principal if the person commits a punishable offense or "aids, abets, counsels, commands, or procures its commission[.]" Aiding and abetting requires proof of the following: "(1) the specific intent to facilitate the commission of a crime by another; (2) guilty knowledge on the part of the accused; (3) that an offense was being committed by someone; and (4) that the accused assisted or participated in the commission of the offense." *United States v. Pritchett,* 31 M.J. 213, 217 (C.M.A. 1990) (citations omitted).

As the Court of Appeals for the Armed Forces notes, "[o]ur case law follows Judge Learned Hand's interpretation of aiding and abetting, under which it is necessary that the accused 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, [and] that he seek by his action to make it succeed.'" *Id.* (quoting *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir. 1938)).

Here, we are tasked with determining whether the appellant specifically intended to facilitate the rape of LCpl P by LCpl Arroyo. Or, in Judge Hand's phraseology, did the appellant associate himself with LCpl Arroyo's rape of LCpl P; did he participate in the rape as something he wished to bring about; and by holding LCpl P down did he seek to make LCpl Arroyo's rape succeed?

On these final two points, we the find the proof fails.

Within the record, there is little direct evidence of the appellant's intent regarding LCpl Arroyo's rape of LCpl P. At trial, there was no indication that the appellant and LCpl Arroyo communicated prior to the assault regarding their sexual desires for LCpl P. When LCpl Arroyo convinced LCpl P to spend the night at his parents' house, there was no accompanying evidence that the appellant knew or expected LCpl Arroyo to engage LCpl P in sexual activity that night. And, indeed, it was then arranged that LCpl Arroyo would sleep on the separate, single bed alone wearing the same clothes he wore that day. The guest room was dark that night, and it was difficult to see. As such, there was no sign that the appellant and LCpl Arroyo communicated, either

---

by the arm, put his hands around her neck, dragged her to some bushes, and pulled her to the ground), *rev. denied*, 75 M.J. 288 (C.A.A.F. 2016).

verbally or non-verbally, in the immediate lead-up to LCpl Arroyo first forcing himself on LCpl P. The appellant did repeatedly utter "calm down" during LCpl Arroyo's assault, but it is unclear whom he intended to calm by his statement.

Regardless, specific intent may be inferred from the circumstances of the particular case. *United States v. Mitchell*, 66 M.J. 176, 178 (C.A.A.F. 2008). In this case, the simultaneous occurrence of LCpl Arroyo's attack and the appellant's act of holding the victim down by her shoulders may be circumstantial evidence that the appellant intended to help LCpl Arroyo rape LCpl P. However, any indication that he held her down pursuant to a "concert of purpose"[18] is offset by the appellant's sinister act of pushing LCpl Arroyo away for the apparent reason of keeping the victim all to himself.

Left with contrary circumstantial evidence of the appellant's intent pointing toward different possible conclusions—that he intended to aid LCpl Arroyo and that he intended to stop LCpl Arroyo—we must find that the evidence fails to prove *beyond reasonable doubt* that the appellant acted with the specific intent to facilitate the commission of a crime by another.

## C. Denial of expert assistance

On 21 September 2015, the appellant requested the assistance of a specific expert consultant in the field of forensic psychology to advise on the effects of alcohol on the victim's memory, for use during the merits,[19] and a specific expert consultant in the field of clinical psychology to advise on the likelihood of recidivism by the appellant, for use during presentencing.[20] The military judge denied both requests.

On 22 October 2015, the defense filed a second motion requesting the assistance of a specific expert consultant in the field of forensic psychology, again seeking assistance regarding the effects of alcohol on the victim's memory, but now classifying this issue as "confabulation."[21] They also renewed their request for a specific expert consultant in the field of clinical psychology to advise on the likelihood of recidivism by the appellant and his rehabilitative potential.[22] To this, they added a motion to compel employment of a specific forensic toxicologist to assist them in evaluating the intoxication

---

[18] Appellee's Brief of 18 Jan 2017 at 18.

[19] Appellate Exhibit (AE) XIV.

[20] AE XII.

[21] AE XXIV at 4.

[22] AE XXVI.

levels of the various participants and the impact of alcohol on the victim's memory.[23]

The military judge denied the defense's motions for all three experts and prepared findings of fact and conclusions of law. She concluded that the appellant failed to show why forensic psychologist and toxicologist assistance was needed or what that assistance would accomplish as there was scant evidence that LCpl P was appreciably impaired by alcohol at the time of the offenses. LCpl P described her state that evening as merely "tipsy,"[24] and she testified that she stopped drinking several hours before the assaults occurred. Additionally, the defense failed to articulate a factual basis establishing that LCpl P's memories were compromised by alcohol or by the proximity of the two rapes to each other. The military judge also noted that neither offense alleged that the victim was incapacitated due to alcohol.

Likewise, the military judge concluded that the defense failed to demonstrate the need for a clinical psychologist. Although the defense argued that the assistance of a clinical psychologist was needed to conduct recidivist testing and discuss rehabilitation principals during the sentencing phase, the defense linked this assistance to rebutting government claims that the appellant was a "predator." However, the government did not allege another incidence of sexual misconduct separate from that arising on 15 February 2014 and did not assert the appellant was a "predator" during its case.

The military judge then concluded, for all three requested experts, that:

> [t[he defense has failed to meet its burden to demonstrate what the requested expert, or expertise, would accomplish in this case or that [the appellant] cannot receive a fundamentally fair trial without the [g]overnment's production of that expertise.[25]

The defense is entitled to an expert's assistance upon demonstration of necessity and a showing that "'denial of expert assistance would result in a fundamentally unfair trial.'" *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F. 2005) (quoting *United States v. Gunkle*, 55 M.J. 26, 31 (C.A.A.F. 2001)). The appellant must prevail on both prongs by a "reasonable probability." *Id.*

The "necessity" standard has a three-part test under which the appellant "must show (1) why the expert assistance is needed; (2) what the expert

---

[23] AE XXVIII.

[24] Record at 316.

[25] AE LXV at 3; AE LXVI at 4.

assistance would accomplish for the accused; and (3) why the defense counsel were unable to gather and present the evidence that the expert assistance would be able to develop." *Bresnahan*, 62 M.J. at 143 (footnote omitted).

"A military judge's ruling on a request for expert assistance will not be overturned absent an abuse of discretion." *Id.* (footnote omitted). Here, we concur with findings and conclusions of the military judge. The defense failed to demonstrate both the necessity of the requested expert assistance and that the absence of such assistance would result in a fundamentally unfair trial. As a result, we find that the military judge did not abuse her discretion.

**D. Improper argument**

The appellant alleges that the trial counsel committed prosecutorial misconduct during closing arguments, when, (1) she stated that the appellant and LCpl Arroyo turned LCpl P "into a piece of meat;"[26] (2) she argued that the appellant "knows what happens to rapists. They go to jail for a long time[;]"[27] (3) she characterized the defense's theory as "absurd, ridiculous, preposterous, and utterly outside of the realm of your knowledge of basic human nature[;]"[28] and (4) when she referred to the appellant as "that thing over there."[29]

"Prosecutorial misconduct occurs when trial counsel overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." *United States v. Hornback*, 73 M.J. 155, 159 (C.A.A.F. 2014) (citations and internal quotation marks omitted). "Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)).

"Improper argument is one facet of prosecutorial misconduct." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citing *United States v. Young*, 470 U.S. 1, 7-11 (1985)). In determining whether an argument is improper, we consider whether "[t]he improper comments in this case" were or "were not isolated" incidents. *United States v. Carter*, 61 M.J. 30, 34 (C.A.A.F. 2005). Indeed, "the argument by a trial counsel must be viewed

---

[26] Record at 614.

[27] *Id.* at 624.

[28] *Id.* at 647, 648.

[29] *Id.* at 649.

within the context of the entire court-martial," and as a result, "our inquiry should not be on words in isolation, but on the argument as 'viewed in context.'" *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (quoting *Young*, 470 U.S. at 16).

When a proper objection to a comment is made at trial, we review for prejudicial error. *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citing Art. 59, UCMJ). When there is no objection, however, the trial defense counsel forfeits the issue and we review for plain error. *United States v. Rodriguez*, 60 M.J. 87, 88 (C.A.A.F. 2004). To show plain error, the appellant must persuade this court that: "'(1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused.'" *United States v. Tunstall*, 72 M.J. 191, 193-94 (C.A.A.F. 2013) (quoting *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011)). The plain error doctrine is "to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Causey*, 37 M.J. 308, 311 (C.M.A. 1993) (citations and internal quotation marks omitted).

1. *"They turned her into a piece of meat."*

During closing argument, trial counsel argued:

> That guy [the appellant] and [LCpl] Arroyo took away her right to self-determination, her right to say what happens to her own body. They turned her into a piece of meat.[30]

Trial counsel then immediately pivoted to a discussion of the standard of proof and the elements of the alleged offenses. The defense did not object to this statement. As a result, we review for plain error and find none.

Disparaging comments directed at the accused are generally improper. *Fletcher*, 62 M.J. at 182. While the relevancy of the comment here to the merits of the case or to the findings is not wholly apparent, the comment does not appear directed at the appellant. Instead, it seems calculated to articulate harm to the victim's esteem, and was, therefore, perhaps better suited to an argument on sentencing. Regardless, the comment was "not so obviously improper as to merit relief in the absence of an objection from counsel." *Id.* at 183.

---

[30] *Id.* at 613-14.

*2. Rapists "go to jail for a long time."*

Next, trial counsel discussed the appellant's text messages sent to LCpl P during their pretext interactions arranged by Naval Criminal Investigative Service. The trial counsel argued:

> And then he starts begging. Begging. For more time with his family. Do you want to know why he's begging for more time with his family? Because he knows what happens to rapists. They go to jail for a long time. That's why he's begging for time with his family. This isn't somebody who thinks he made an innocuous mistake. This is somebody who knows he did indeed f[***] up.[31]

At the end of trial counsel's argument, the defense objected and the military judge provided a curative instruction:

> Members, there was a comment made during the government's closing regarding – essentially regarding potential punishments for somebody convicted of the offense of rape. If sentencing is necessary in this case, that comes later, disregard that statement or, sort of, any thoughts about punishment. That's a separate portion of any trial than the findings phase.[32]

The members then agreed to disregard the trial counsel's statement.

Trial counsel may "forcefully assert reasonable inferences from the evidence." *United States v. Coble*, No. 201600130, 2017 CCA LEXIS 113, at *10, unpublished op. (N-M. Ct. Crim. App. 23 Feb. 2017) (quoting *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008)), *rev. denied*, __ M.J. __, 2017 CAAF LEXIS 679 (C.A.A.F. Jul. 10, 2017). Here, the trial counsel attempted to infer consciousness of guilt from appellant's messages during the pretext exchange—that he "begged" for more time with his family because he feared significant time in confinement once the allegation was made. At the same time, the argument implied, perhaps inadvertently, that a significant sentence to confinement was to be expected. In that regard, the trial counsel's argument was inarticulate. But it did not rise to the level of prejudicial error, particularly in light of the military judge's curative instruction and the agreement by the members to disregard the argument to the extent that it proffered a possible punishment.

---

[31] *Id.* at 624.

[32] *Id.* at 628.

*3. "Absurd, ridiculous, preposterous" and "that thing over there."*

In closing, the defense argued that "to a certain degree, [LCpl P] needs justice. Something happened that night between her and [LCpl] Arroyo. But that person is not [the appellant]. Justice needs to be served on [LCpl] Arroyo."[33] In response, the trial counsel rebutted:

> And [LCpl] Arroyo goes away and consensual sex takes place. Rape and consent. . . . Does that make any bit of sense with your training, your experience, your education, your knowledge of the ways of the world? Yes, members, rape happened. [LCpl] Arroyo testified to it. It did. Consent didn't happen. Not once, not ever. Any suggestion to the contrary – again, this is a strong word but I feel like when a concept like rape and consent in one moment is raised the only word for that is absurd. Actually there's more words for that:  absurd, ridiculous, preposterous, and utterly outside of the realm of your knowledge of basic human nature.[34]

The defense did not object to this statement.

Subsequently, the trial counsel closed with: "And those texts, desperation. . . . From that thing over there, desperation because he knew what was coming."[35]

The military judge then, *sua sponte*, sharply rebuked the trial counsel, instructing the members:

> [P]lease disregard the statement from [the trial counsel] regarding her reference to [the appellant]. His name is Lance Corporal Ramirez, he is the accused in this case. He shouldn't be called any pejorative during the closing argument.[36]

It is "plainly improper" argument to disparage defense counsel and thereby "encourage[] the members to decide the case based on the personal qualities of counsel rather than the facts." *Fletcher*, 62 M.J. at 182. "Disparaging comments are also improper when they are directed to the defendant himself." *Id*. However, while the two disputed statements here were ill-conceived, when taken in context of the entire argument, we do not find they rise to the level of prosecutorial misconduct.

---

[33] *Id*. at 646.

[34] *Id*. at 647-48.

[35] *Id*. at 649.

[36] *Id*. at 649-50.

Regardless, assuming *arguendo* that the two statements by trial counsel were improper, we find no prejudice. In assessing for prejudice, we look at the cumulative impact of any misconduct on the appellant's substantial rights and the fairness of his trial by balancing "three factors: (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Id.* at 184. Prosecutorial misconduct requires reversal when the trial counsel's behavior, taken as a whole, was "so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone." *Id.*

Here, the two disputed statements were minor parts of a lengthy court-martial and were not reflective of the government's general theme or theory. Additionally, the impact of these isolated statements vanishes when measured against the weight of the government's case in support of the rape of LCpl P. Finally, while primarily directed at the "that thing" comment, the military judge's admonition against pejorative argument by trial counsel also helped to ameliorate any disparaging conclusions the members may have drawn about the appellant or his counsel based upon the two statements by trial counsel.

For these reasons, we are "confident that the members convicted the appellant on the basis of the evidence alone." *United States v. Sewell*, 76 M.J. 14, 15 (C.A.A.F. 2017) (citation and internal quotation marks omitted).

### E. Ineffective assistance of counsel

The appellant alleges his counsel were ineffective for: (1) failing to "recognize and clearly challenge" the principal liability theory put forward by the government as to Specification 3 of the Charge; (2) failing to bring a motion for a finding of not guilty as to Specification 3 of the Charge pursuant to RULE FOR COURT-MARTIAL 917, Manual for Courts-Martial, United States (2012 ed.); (3) failing to object to the military judge's instructions as they related to principal liability theory; and (4) failing to object to the arguments of trial counsel.

Ineffective assistance of counsel involves a mixed question of law and fact. *United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F. 2001). The ultimate determinations of whether counsel was deficient and whether the deficiency was prejudicial are reviewed *de novo*. *Id.*; *United States v. McClain*, 50 M.J. 483, 487 (C.A.A.F. 1999).

We apply the two-prong test set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984) to determine whether counsel rendered ineffective representation. "The burden on each prong rests with the appellant challenging his counsel's performance." *United States v. Davis*, 60 M.J. 469, 473 (C.A.A.F. 2005).

The first prong requires the appellant to show that counsel's performance fell below an objective standard of reasonableness, indicating that counsel was not functioning as counsel within the meaning of the Sixth Amendment. *United States v. Terlep*, 57 M.J. 344, 349 (C.A.A.F. 2002). Our review of counsel's performance is highly deferential and is buttressed by a strong presumption that counsel provided adequate representation. *United States v. Garcia*, 59 M.J. 447, 450 (C.A.A.F. 2004).

The second prong requires a showing of prejudice resulting from counsel's deficient performance. *Strickland*, 466 U.S. at 687. Such prejudice must result in the denial "of a fair trial, a trial whose result is unreliable." *United States v. Dewrell*, 55 M.J. 131, 133 (C.A.A.F. 2001) (citation and internal quotation marks omitted). The appropriate test for this prejudice is whether there is a reasonable probability that, but for counsel's error, there would have been a different result. *United States v. Quick*, 59 M.J. 383, 387 (C.A.A.F. 2004).

Our determination above related to Specification 3 of the Charge resolves the first three allegations of ineffective assistance of counsel. Given our analysis regarding the appellant's assertion of improper argument, the appellant fails to demonstrate that his trial defense counsel's performance was deficient, and he cannot, therefore, overcome the strong presumption of adequate representation.

## F. Reassessment of the sentence

Having set aside one of the two convictions for rape, we must reassess the sentence. Courts of Criminal Appeals (CCAs) can often "modify sentences 'more expeditiously, more intelligently, and more fairly' than a new court-martial[.]" *United States v. Winckelmann*, 73 M.J. 11, 15 (C.A.A.F. 2013) (quoting *Jackson v. Taylor*, 353 U.S. 569, 580 (1957)). In such cases, CCAs "act with broad discretion when reassessing sentences[.]" *Id*.

Reassessing a sentence is only appropriate if we are able to reliably determine that, absent the error, the sentence would have been at least of a certain magnitude. *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000). A reassessed sentence must not only "be purged of prejudicial error [but] also must be 'appropriate' for the offense involved." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986).

We base these determinations on the totality of the circumstances of each case, guided by the following "illustrative, but not dispositive, points of analysis":

(1) Whether there has been a dramatic change in the penalty landscape or exposure.

(2) Whether sentencing was by members or a military judge alone.

(3) Whether the nature of the remaining offenses captures the gravamen of criminal conduct included within the original offenses and whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses.

(4) Whether the remaining offenses are of the type with which appellate judges should have the experience and familiarity to reliably determine what sentence would have been imposed at trial.

*Winckelmann*, 73 M.J. at 15-16.

Under all the circumstances presented, we find that we can reassess the sentence and that it is appropriate for us to do so. First, the penalty landscape is unchanged. The maximum punishment remains a sentence to life without eligibility for parole. Second, we have extensive experience and familiarity with the remaining offense of rape by unlawful force, and it does not present any novel issues in aggravation. Finally, the remaining offense captures the gravamen of the criminal conduct at issue—the forcible rape of LCpl P—and all of the evidence introduced in aggravation during the court-martial remains admissible against the appellant.

Taking these facts as a whole, we can confidently and reliably determine that, absent the error, the members would have sentenced the appellant to at least confinement for eight years, reduction to pay grade E-1, total forfeitures, and a dishonorable discharge. We also conclude that the adjudged sentence is an appropriate punishment for the offense and this offender— thus satisfying the *Sales* requirement that the reassessed sentence not only be purged of error, but appropriate. *Sales*, 22 M.J. at 308.

In arriving at this sentence, we note the apparent disparity with LCpl Arroyo's sentences for his acts on the same evening. As part of a pretrial agreement, in exchange for his cooperation in the appellant's court-marital, LCpl Arroyo pleaded guilty at special court-martial to assault consummated by battery. He was sentenced to nine months' confinement, reduction to pay grade E-1, forfeiture of $900.00 pay per month for nine months, and a bad-conduct discharge. He was also convicted of false imprisonment by the Superior Court of California, County of Los Angeles, and was sentenced to 180 days' confinement and five years' probation.

To receive relief based on sentence disparity in the exercise of our unique, highly discretionary authority to determine sentence appropriateness under Article 66, UCMJ, the appellant must demonstrate "that any cited cases are 'closely related' to his or her case and that the sentences are 'highly disparate.' If the appellant meets that burden . . . then the Government must show that there is a rational basis for the disparity." *United States v. Lacy*, 50 M.J. 286, 287 (C.A.A.F. 1999). "Closely related" cases involve "offenses that

are similar in both nature and seriousness or which arise from a common scheme or design." *United States v. Kelly,* 40 M.J. 558, 570 (N.M.C.M.R. 1994)[37] However, co-actors are not entitled to equal sentences. *United States v. Durant*, 55 M.J. 258, 260 (C.A.A.F. 2001).

In assessing whether sentences are highly disparate, we are "not limited to a narrow comparison of the relative numerical values of the sentences at issue" but may also consider "the disparity in relation to the potential maximum punishment." *Lacy*, 50 M.J. at 287. A vast difference in maximum punishments can result from the disposition forums. A convening authority's discretion on "the selection of the appropriate forum for disposition is part of prosecutorial discretion," and "[d]ecisions on how to process a case are not considered *de novo* at the reviewing court level." *Kelly*, 40 M.J. at 570. If cases are closely related yet result in widely disparate disposition, we must instead decide whether the disparity in disposition also results from good and cogent reasons. *Id.*

While we agree that the appellant's and LCpl Arroyo's cases are closely related, there exist good and cogent reasons for the disparity in sentence. First, LCpl Arroyo's case was resolved at special court-martial, where he voluntarily pleaded guilty to reduced charges in consideration for his cooperation in the prosecution of the appellant. Second, LCpl Arroyo faced related charges in a civilian court, to which he pleaded guilty and was sentenced to a significant period of probation. The decision by the convening authority to enter into a pretrial agreement that included reduced charges and forum, and by the County of Los Angeles to separately pursue a criminal case against LCpl Arroyo, were well within their discretion, and we will not challenge those decisions in an effort to numerically level an otherwise just sentence.

### III. CONCLUSION

The finding of guilty to Specification 3 of the Charge is set aside. The remaining findings of guilty to the Charge and Specification 5 thereunder and to so much of the sentence as extends to 8 years' confinement, reduction to pay grade E-1, forfeiture of all pay and allowances, and a dishonorable discharge are affirmed.

Senior Judge MARKS and Judge JONES concur.

For the Court

R.H. TROIDL
Clerk of Court



---

[37] *See also Lacy*, 50 M.J. at 288.